**dB SALES, INC., Plaintiff,**

v.

**DIGITAL EQUIPMENT CORP., Defendant.**

No. 5:95CV1844.

United States District Court, N.D. Ohio, Eastern Division.

Oct. 28, 1996.

John A. Huettner, Joel L. Levin, John P. Schloss, Nurenberg, Plevin, Heller & McCarthy, Cleveland, OH, for plaintiff dB Sales, Inc.

Shepard M. Remis, Goodwin, Procter & Hoar, Boston, MA, Ralph Streza, Alan C.

Yarcusko, Porter, Wright, Morris & Arthur, Cleveland, OH, for defendant Digital Equipment Corporation.

### MEMORANDUM OPINION

(Resolving Docket No. 110)

DOWD, District Judge.

### I. INTRODUCTION

In this diversity case arising from the termination of a business relationship, the defendant has moved for summary judgment on the plaintiff's claims of breach of contract, fraud, promissory estoppel and misappropriation of trade secrets (Docket No. 110). The matter has been briefed extensively by both parties. For reasons set forth below, the Court grants the motion for summary judgment.

### II. FACTUAL BACKGROUND

The defendant, Digital Equipment Corporation ("Digital"), is a Massachusetts-based computer manufacturer. The plaintiff, dB Sales, is an Ohio corporation engaged in the business of representing manufacturers of personal computers and accessories. dB Sales has been in business for nearly twenty years as a manufacturer's representative.

A manufacturer's representative contracts with a manufacturer to promote the manufacturer's product. Duties can include arranging the sale of the product to the manufacturer's customers and teaching the customers the best way to market the product. Manufacturer's representatives frequently are paid on a commission basis, receiving a percentage of sales originated. Not all manufacturers choose to use representatives; some market their products directly to customers. In the computer and electronics industry, some manufacturers use representatives when marketing a new product and later drop the representatives and market the products directly with their own sales force. Others retain representatives on a continuous basis. It is common within the industry that a contract between a manufacturer and its representative include a clause allowing either party to terminate the business relationship upon relatively short (30 to 60 days) notice.

dB Sales was the manufacturer's representative in a six-state area, including Ohio, for Packard Bell Corporation, a California computer manufacturer, from 1989 to 1995, a period during which Packard Bell became one of the largest personal computer manufacturers in the world. The business relationship was renewed annually by written contract. After the 1994 contract expired, the parties continued doing business while negotiating a new agreement in early 1995. At a meeting in February 1995, Packard Bell proposed reducing its commissions to dB Sales across the board, in many cases drastically. (Depo. of Packard Bell's Rick Lovisolo at 50–51; depo. of dB Sales' Bruce Finn at 373–80). For example, Packard Bell proposed cutting its commission on sales to Office Max, dB Sales' biggest Packard Bell account, from 1.5 percent to 0.1 percent, while at the same time projecting that sales to Office Max would increase from $50 million in 1994 to $200 million in 1995.[1] (Finn depo. at 373, 376–77). Commissions on other accounts from which dB Sales was accustomed to earning a one to two percent commission were proposed to be halved while sales were expected to increase significantly. (Id. at 378). dB Sales had received between $1.3 million and $1.4 million from Packard Bell in 1994. The proposed cuts, even coupled with the projected increased volume of sales, would have reduced its commissions to roughly $1 million in 1995, based on the figures presented by Packard Bell, according to dB Sales' president Bruce Finn. (Id. at 379–80).

Finn testified he believed the figures put forth by Packard Bell were a starting point for negotiations. He wrote to Packard Bell vice president Rick Lovisolo on February 13, 1995, stating he was "startled not only by the size of the proposed quota, but by the degree of the reduced commissions as well." (Finn letter to Lovisolo, Def. Exh. R). Finn stressed in his letter that dB Sales had worked faithfully for Packard Bell since 1989, work that began to pay off by the end of

---

1. The Office Max account produced approximately half of the total sales volume of Packard Bell products for dB Sales in 1994. (Finn depo. at 376–77).

1994, but "what Packard Bell has proposed for the future does not work." (*Id.*). Finn provided Lovisolo with a chart showing that dB Sales had originated $85.8 million in Packard Bell sales in 1994 and had received $1.365 million in commissions. According to Packard Bell's offer, dB Sales was expected to originate $370.3 million in sales and receive only $1.015 million in commissions. Under such projections, Finn wrote Lovisolo, "not only could we not fulfill our commitments, but we would do it in less than the way Packard Bell would want it done and both companies would be less than happy with the results. If this year is to be the last year we are to work together then let us do it with the same professionalism, the same enthusiasm and the same integrity we have always done it with in the past." (*Id.* at 2). Packard Bell eventually agreed to some increase from its original proposed commission cuts. For example, it offered a commission of .375 percent for Office Max, dB Sales' largest Packard Bell account, a level still one-fourth the level of the 1.5 percent in 1994.

In the meantime dB Sales learned that Digital had entered the retail home personal computer ("PC") market with a line of PCs sold under the trade name "Starion" and was seeking manufacturer's representatives throughout the United States. Digital hired Rod Keller, a former executive with another large computer company, to develop Digital's retail home PC business. (Keller depo. at 14–15). Keller interviewed dozens of manufacturer's representatives in late 1994 and early 1995 to establish a network of representatives to cover the United States. Eventually Keller selected nine representatives to accomplish that purpose.

During the process of selecting manufacturer's representatives, Keller called Finn and told him he was looking for a manufacturer's representative in the Ohio and Michigan areas to market the Starion computers.

(Keller depo. at 29–30). Such an arrangement would require dB Sales to sever its relationship with Packard Bell because large computer companies require exclusive representation. Finn testified that after speaking to Keller, he conferred with dB Sales' vice president Jay Regallis about the pros and cons of staying with Packard Bell as opposed to signing on with Digital. He said he recognized the potential that Packard Bell was "winding it down with the rep firms over the next year or two," i.e., that Packard Bell was considering eliminating manufacturers' representatives. (Finn depo. at 193).[2]

Keller and Finn had a number of telephone conversations in February. (Keller depo. at 32). On February 24, Keller faxed Finn a copy of Digital's proposed manufacturer's representative agreement (Def.Exh. S). The agreement listed a six-state area for which dB Sales would serve as Digital's representative.[3] It called for Digital to pay a 1.5 percent commission on all sales generated by dB Sales. The contract defined in detail the parties' duties to each other. It also included the following terms which are critical to the instant dispute:

8. ***Term.*** This Agreement shall commence as of the date first above written and shall terminate on the Termination Date.

9. ***Termination.*** This Agreement may be terminated at any time by either DIGITAL or Representative upon thirty (30) days *advance written notice* to the other. The date specified in such a notice as the termination date or, if no date is specified, that date that is thirty (30) days after the receipt of the notice shall be the "Termination Date."

The contract also included a provision giving Digital "complete discretion to accept or reject, in whole, in part or on any condition, purchase orders submitted by [dB Sales]." (*Id.* at ¶ 6.B). Finally, the Agreement in-

---

2. Lee Akrich, executive vice president of Packard Bell, testified that Packard Bell's long-term plans included "tak[ing] the company direct," i.e., eliminating manufacturer's representatives. (Akrich depo. at 11). Packard Bell had not established a timetable on when such a transition would be made. (*Id.*).

3. The states were Ohio, Michigan, Indiana, Kentucky, West Virginia and Western Pennsylvania. (Def.Exh. S).

cluded a paragraph entitled "Remedies and Limitations" which stated in full:

> Digital makes no representations, warranties or assurances of any kind or nature to manufacturer's representative, with respect to the products, either expressed or implied, including without limitation, any implied warranty or condition or merchantable quality or fitness for a particular purpose, whether, arising by statute or otherwise, or from a course of dealing or usage of trade. <u>Digital's liability to manufacturer's representative for any cause whatsoever will be for direct damages only, and will be limited to the lesser of one million dollars ($1,000,000) or the sum of the commissions paid to the manufacturer's representative during the previous twelve (12) months.</u> The foregoing limitation does not apply to damages resulting from personal injury caused by Digital's negligence. In no event will Digital be liable for any damages resulting from loss of data or use, <u>lost profits</u> or any incidental or consequential damages.

(*Id.* at ¶ 12) (underlining added). The prior paragraph was typed entirely in capital letters in the proposed agreement, the only paragraph so highlighted.

Keller traveled to Ohio for a meeting with dB Sales' top executives on March 7. Attending were Finn, Jay Regallis and Joe Regallis, national marketing and sales director.[4] Finn and Jay Regallis testified that the parties discussed at some length Paragraph 8 of the agreement, i.e., the "Term" provision, and that dB Sales requested a more definite term than the open-ended one in the proposed contract. Both testified that Keller told them he was unable to change the written contract but assured them that the business relationship would last a minimum of three years. The importance of the alleged conversations compels the Court to quote at length from the deposition transcripts. Following is an excerpt from the deposition of Bruce Finn:

A. I may have said in our conversation that we had received information that multi-year contracts were being offered to other reps [manufacturer's representatives].

Q. What did [Keller] say?

A. His response was in answer to the total conversation rather than to that specific question because I—

Q. He didn't answer that specific question?

A. No. We had been talking and I had asked him if he would arrange for us to have, to get a multi-year contract because of our willingness to resign a company who as paying us, you know, multi-million dollars of commissions and we had them for a very long time.

Q. What did he say to that?

A. His response was that he could not get me a written contract because they had already signed with all the other rep firms and that legal would not permit him to sign a separate contract with a single rep firm.

. . . . .

Q. Did you respond to that statement by Mr. Keller?

A. I believe Jay [Regallis] responded to him.

Q. What do you recall Jay saying?

A. Jay said that he felt that it was too great of a risk for us to consider resigning something that we knew that we had versus something that we felt was going to take a lot of hard work and a lot of pioneering and there was no definite guarantee on how successful we would be, although he had talked about the confidence that we had to build the line, and he took on a negative role to Rod concerning his response.

Q. Please explain what you mean by he took on a negative role to Rod.

A. Mr. Regallis, Jay Regallis, is an extremely thorough individual. He's a person that's quite analytical and he takes everything at face value. And he felt that it was a cop-out that Rod

---

**4.** Because both Jay Regallis and Joe Regallis work for dB Sales, this memorandum opinion will use their first and last names when referring to them.

could not persuade his management for what we were willing to do, if we were going to do it, and to give us a written contract.

. . . . .

Q. Did Mr. Keller respond to Mr. Regallis?

A. Yes.

Q. What did he say?

A. He said to him, you're going to have the line at least three years. . . . I would not have gone out and done all this work, bring in all these people, develop all these programs if I wasn't sure that Digital was committed to a long-term rep program.

(Finn depo. at 240–42). Later in his deposition Finn again discussed conversations regarding the length of the agreement:

Q. Anything else about, any other discussion about the length of the relationship?

A. Yes. I asked Mr. Keller a question. The question was, does Digital have the stomach, are they prepared for the competition and the willingness to invest into the market to gain market share, because our understanding of the business, that a number of manufacturers had entered into the computer business and dropped out because it is highly competitive.

Mr. Keller's response was, yes, not only do they have the stomach, but the plan is the willingness to lose money the first two years to gain market share and become a top tier player.

(*Id.* at 243–44). Finn testified that the discussion of term of the contract arose again at the conclusion of the March 7 meeting:

A. . . . Jay Regallis asked Rod again at the end of our being together in a conference room, I am still not convinced why we should resign Packard Bell to take on Digital. And Rod responded with, we are one of the world's largest companies in PCs, 14 or 15 billion, I don't remember the exact number that he used, we have brand awareness already all over the

corporate marketplace, we're going to become a dominant player and I need your type of company to help us get to where we are going to go and I have a three-year contract with Digital and as long as I am there, I will guarantee that you guys will be part of the group.

Q. Keller said he would guarantee it?

A. Yes.

(*Id.* at 245). Finn acknowledged that he never asked Keller to change the language in the agreement or to provide a letter reflecting his oral three-year commitment. (*Id.* at 246–47). Nor, despite all of the alleged discussion about the proposed term of the contract, did he ask that the 30–day termination clause in the contract be dropped. (*Id.* at 251).

Jay Regallis also testified in deposition that Keller promised that Digital would retain dB Sales for a minimum of three years:

A. . . . Rod's presentation was that it was a three year contract, that his contract was three years, that he was in it for the duration, and that he needed us to help him be successful at retail. That we knew retail, Digital did not. He needed a company with our expertise, background and success with Packard Bell, . . .

. . . . .

Q. When Rod said to you that he couldn't put the three year commitment in writing, what was your understanding as to why that was?

A. Rod very specifically stated that he could not put three years in writing because he believed he would have problems with his legal department because he had already signed contracts with manufacturer's representatives with one year contracts.

(Jay Regallis depo. at 138–39). Jay Regallis said Keller's assurance about the duration of the contract "was singularly probably the biggest thing that made me become an ally to Bruce [Finn] in resigning Packard Bell." (*Id.* at 135). Jay Regallis acknowledged that he understood, even with a three-year commitment, the contract still would contain a

termination clause allowing either party to terminate the business relationship upon 30 days notice. He said that such termination clauses are "fairly common in the industry" and that because of Keller's representations the clause "was not a concern." (*Id.* at 137).

dB Sales produced four pages of handwritten notes taken by Jay Regallis at the meeting. There is no mention of a discussion of a three-year term. dB Sales has represented to opposing counsel and to the Court that no other dB Sales representative has notes from that meeting.

For his part, Keller testified he had no recollection of ever having a conversation with anyone at dB Sales in which there was a discussion of a three-year term. (Keller depo. at 48–49). He also testified he did not offer any manufacturer's representative a contract for the Starion line which did not contain a 30–day termination provision. (*Id.* at 22).

On March 9, 1995, two days after the meeting, Finn signed the contract and returned it to Keller for execution on the part of Digital. He wrote a cover letter which stated in part the following:

> Enclosed are the two executed representative agreements. It would be considered a great favor if you would allow the official beginning date to be April 1, 1995. The dB Group owes it to both Packard Bell and our retailers to provide a smooth transition. This additional time would allow us that opportunity. It would not, however, preclude our immediate communication on Digital's behalf for appointments with the principals of ABC Warehouse, h.h. Gregg, Sun, Micro Center and OfficeMax.

(Def.Exh. P). Raymond Weadock, Vice President and General Manager of Digital, executed the contract on Digital's part on March 16, 1995.

Despite having signed and returned the contract to Digital, Finn wrote a letter to Packard Bell's executive vice president Lee Akrich on March 15, outlining a detailed proposal for commission rates for a 1995 contract with Packard Bell. Finn requested Packard Bell incorporate dB Sales' proposed rates into a contract which would extend through March 31, 1996. Had Packard Bell accepted the proposal, dB Sales would have been forced to abort its budding relationship with Digital, as dB Sales could not serve as the exclusive representative for two companies. Packard Bell did not accept the proposal. (Lovisolo depo. at 114).

dB Sales argues in its brief, with no citation to Finn's deposition testimony, that the March 15 letter to Packard Bell was merely a "face-saving" letter which included proposals Finn knew Packard Bell would not accept. (Pl. brief at 7). This made it easier for dB Sales to terminate its relationship with Packard Bell and begin business with Digital, according to the brief. Packard Bell's Lovisolo testified that shortly after receiving the March 15 letter, he spoke with Finn, and "Bruce expressed the posture that as much as it pained him to see our relationship severed, that in the absence of our granting these concessions, and in the presence of what he considered to be a stronger long-term opportunity with Digital, he had no choice but to move forward with his plans to resign the line." (Lovisolo depo. at 87).

Thus dB Sales began representing Digital on April 1, 1995. From April through August dB Sales earned approximately $33,600 in commissions through sales of Digital products. However, on August 2, dB Sales received a letter from Keller announcing that Digital was exercising its contractual right to terminate the business relationship upon thirty days notice. (Def.Exh. U). Digital terminated its business relationship with all of its manufacturer's representatives nationwide at that time. It cited rapid changes in the marketplace requiring "significant organizational changes that will provide us with the necessary structure and resources to effectively support a profitable relationship with the retail channel." (Keller letter, Def. Exh. U).

Robert Gregerson, who at the time of the termination was national sales manager for the company's retail personal computer business unit, provided deposition testimony and an affidavit stating that several business developments between March and August precipitated the decision to terminate the manufacturer's representatives' contracts. A

major competitor, Compaq Computer, slashed its prices on PCs in May, according to Gregerson (Gregerson affid. at ¶ 5). Digital felt it had to follow suit, thereby exacerbating its losses. (*Id.*) Gregerson testified that upper management informed his division in July that unless the administrative costs of selling Starion PCs were reduced by a figure equaling two percent of gross sales, Digital would exit the home PC business. (Gregerson depo. at 96). Digital decided the best way to achieve the two percent reduction was to eliminate the 1.5 percent commission paid to manufacturer's representatives. Gregerson averred that Digital never made money, or even broke even, on the Starion computers. (Gregerson affid. at ¶ 3). Eliminating manufacturer's representatives did not stop the losses, and in January 1996 Digital announced it would discontinue its Starion line of computers and exit the home PC business. (Press release, Def. Exh. BB).

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *See, e.g., U.S. v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552–53, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mutual Life Assurance Co. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1608 n. 17, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510–11. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the non-

moving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53 (equating the standard for a directed verdict under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citing *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*) and *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2511.

### IV. ANALYSIS

dB Sales filed a five-count complaint against Digital. Count Five, alleging violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.,* was dismissed by this Court on May 17, 1996. At the same time, the Court denied Digital's motion to dismiss the other four counts of the complaint, which include breach of contract, fraud, promissory estoppel and misappropriation of proprietary information. In its May 17 memorandum opinion the Court held that, due to the choice-of-law provision in the contract, Massachusetts law would apply to the breach of contract, fraud and promissory estoppel claims.

The Court held further that the misappropriation of proprietary information claim was not covered by the choice of law provision and thus would be adjudicated under Ohio law. The Court noted the following in its memorandum opinion with respect to that claim:

> Generously construed for purposes of the motion to dismiss, the count states a claim for misappropriation of trade secrets under Ohio's trade secrets statute, O.R.C. § 1333.51, inasmuch as it claims that [Digital] misappropriated confidential business information. [Digital], of course, will have the opportunity to demonstrate that dB Sales has not satisfied the elements of a trade secret violation.

(Mem. op. at p. 15). The Court added in a footnote: "For example, to survive summary judgment, dB Sales must offer evidence that the purported proprietary information meets the statute's definition of a 'trade secret.' *See* O.R.C. § 1333.61(D)." (*Id.* at n. 7).

"Trade secret" is defined under the above-cited Ohio statute as follows:

> "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.R.C. § 1333.61(D). dB Sales appears to have all but abandoned this claim, devoting to it a mere paragraph in a twenty-page brief. dB Sales provides no evidence to demonstrate that any material shared with Digi-

tal meets the definition of "trade secret" under Ohio law. Thus the Court grants summary judgment to Digital with respect to this claim.

The remaining claims are much more hotly contested and conceptually difficult. The position of the parties is quite clear. dB Sales argues that notwithstanding the unambiguous, contradictory provisions of the written contract, the true understanding between the parties was that a three-year contract was being executed and that it reasonably relied, to its detriment, on the oral assurances of Keller. Digital denies Keller made such assurances but insists it does not matter whether he did; it argues that no jury could find that dB Sales reasonably relied on the assurances to its detriment.

Under Massachusetts case law, at least in fraud and estoppel cases, a court may consider pre-execution oral agreements under certain limited circumstances which will be discussed *infra*, even if such agreements contradict the unambiguous terms of a contract. *See McEvoy Travel Bureau, Inc. v. Norton Company*, 408 Mass. 704, 563 N.E.2d 188 (1990).

The court finds that a genuine factual dispute exists on the issue of whether Keller orally promised a three-year term to dB Sales. For purposes of summary judgment, the Court will assume Keller made such a promise.[5] In the Court's view, the dispositive questions then become 1) does such a promise survive in the face of a clear contradictory term—of which dB Sales was aware—in the written version of the contract, and 2) did dB Sales *actually* and *reasonably* rely on the promise to its detriment? The first question is dispositive of the breach of contract claim. The second question is dis-

positive of the fraud and promissory estoppel claims.

Although this case is very well briefed, the parties have done little to distinguish the breach of contract claim from the fraud and estoppel claims. The Court concedes that under the circumstances of this case the contract and tort claims are difficult to separate. The Court shall attempt to do so by focussing on the terms of the contract (oral or written) for the contract claim and on the reliance element of the fraud and estoppel claims.

## A. The Breach of Contract Claim

 dB Sales signed the contract fully aware of both the "term" and "termination" provisions of the written agreement. *See* paragraphs 8 and 9 on page 1325 *supra.* Keller denied the request of Finn and Jay Regallis to insert a long-term provision in the contract, saying "he could not get ... a written contract because ... legal would not permit him." (Finn depo. at 240). The evidence in the record supports no theory upon which dB Sales, as a matter of contract law,[6] can enforce a term which it knew was expressly prohibited in and omitted from the original contract.

As will be discussed in Section B *infra*, Keller's alleged comments, taken as a whole, cannot be reasonably construed to create a binding promise on the part of Digital overriding the express language of the contract. More important to the breach of contract claim, even if Keller's comments could somehow be construed to create a three-year "term" to the contract, they would have no effect on the "termination" provision of the agreement.

---

5. dB Sales receives the benefit of the doubt on this issue despite the fact the Court is of the view that convincing a jury that the promise was made would be an uphill battle. There is nothing in writing corroborating that such a promise was made. To the contrary, the extensive notes of dB Sales' Jay Regallis from the March 7 meeting make no reference to a discussion regarding term.

dB Sales argues that despite Keller's assertions he offered no manufacturer's representative a multi-year contract, there is evidence Digital of-

fered, in writing, at least one other manufacturer's representative a contract with a term of three years. *See* Pl. Exh. 1 (Digital letter to Top Sales, Inc.). However, in the Court's view this revelation cuts against dB Sales because dB Sales received no letter or other written document extending an offer of a determinate length contract.

6. Discussion whether such a promise can be enforced on a theory of fraud or promissory estoppel is reserved for sections B and C *infra*.

The distinction is subtle but critical. Finn and Jay Regallis make clear in their deposition testimony that their discussions with Keller were over the "term" provision of the contract, i.e., paragraph 8 quoted *supra* page 1325. They did not object to the termination provision, paragraph 9, which essentially would trump any time period placed in the term provision. Put another way, if Keller's comments established a three-year term for the contract, they would have no effect on paragraph 9, which allows termination upon 30 days' notice. Finn's testimony on the point was as follows:

Q. Paragraph 9 contains a termination mechanism for the agreement, is that your understanding?

A. Yes.

Q. Did you talk to Mr. Keller at all about the termination provision as opposed to the term of the agreement?

A. I'm not sure that I can recall what I said or how it pertains to your question right now. Will you please repeat—

Q. Did you say to Mr. Keller that's all well and good you are going to give us a three-year term, but I want you to change the contract so you can't terminate it sooner?

A. I didn't do that.

Q. You didn't ask him to make any changes in Paragraph 9 of the agreement, did you?

A. No.

(Finn depo. at 250–51). Likewise, Jay Regallis testified he made no request with respect to the termination provision:

Q. Weren't you concerned that the contract said it was terminable on 30 days' notice, and all you were relying on was an oral representation from Keller that it would go for three years?

A. I was not concerned with that at all. 30-day clauses are fairly common in this industry and they're generally put in there, I suppose, for the manufacturer's purpose of hiring a rep organizations [sic] that sits on their ass and

doesn't do anything for a living and gives them the option of getting out from something that they shouldn't have gotten into. It never entered my mind, the 30-day clause was not a concern.

(Jay Regallis depo. at 137).

Digital presents testimony from others in the industry corroborating Jay Regallis' statement that termination provisions are common and allow parties to exit a contract before its term elapses. Lee Akrich, Packard Bell's vice president, testified, "The way most contracts, rep contracts, are written, they have a 30-day clause in there anyway. There's a 30-day escape clause, so that a year, three years, five years doesn't make any difference. You can get out of them in 30 days." (Akrich depo. at 49–50). Thomas Gust of GB Marketing, another manufacturer's representative, testified as to his experience in representing 300 to 400 manufacturers:

Q. Have you had written agreements with most of those relationships?

A. Yes.

Q. Is it fair to say that most of those agreements are terminable at will?

A. Yes.

Q. Is it fair to say that that's an industry standard?

A. Unfortunately, yes.

Q. When you say "unfortunately, yes," is it fair to say that an inherent risk being of being a manufacturers' rep is that you can be terminated at any time?

MR. HUETTNER: Objection. Go ahead and answer.

A. Yes.

(Gust depo. at 38–39). Finn acknowledged that "not many, but some" of his agreements with manufacturers have at-will termination provisions. (Finn depo. at 330). Moreover, Finn clearly was aware that the *term* of a contract was a different element from the *termination* provision of a contract. His March 15 letter to Packard Bell requested that term of the proposed contract be extended until March 31, 1996—a little over a

year—and at the same time requested that the "cancellation clause" be extended to 90 days notice. (Def.Exh. T). Finn's admitted failure to address the "termination" provision in the Digital contract renders any alleged assurances by Keller regarding the "term" provision meaningless.

Thus even if the Court, in giving dB Sales the benefit of overwhelming doubt, conceded that Keller's comments were sufficient to alter the terms of the written contract and incorporate a three-year term, the termination clause of the contract would still stand, permitting Digital to do what it did—change its business plans. In the Court's view, even if Finn and Jay Regallis believed their conversations regarding a three-year contract somehow superseded the termination clause as well as the term clause, there is no evidence that the parties reached any agreement whatsoever on the termination clause.[7] *See Pahlavi v. Palandjian,* 809 F.2d 938, 945 (1st Cir.1987) ("contracting parties are bound by objective manifestations and expressions, not subjective expectations") (quoting Restatement (Second) of Contracts, § 2, comment b (1981)). In sum, no jury could find that Digital's termination of the business relationship constituted a breach of contract. Summary judgment is therefore appropriate on the breach of contract claim.

### B. The Fraud Claim

Common law fraud in Massachusetts requires the plaintiff to establish the following elements: 1) that the defendant made a knowingly false statement; 2) that the defendant made the false statement with intent to deceive; 3) that the statement was material to the plaintiff's decision to sign the contract; 4) that the plaintiff reasonably relied upon the statement; and 5) that the plaintiff suffers harm as a result of the reliance. *Turner v. Johnson & Johnson,* 809 F.2d 90 (1st Cir.1986).

*Turner* is cited by Digital to support its contention that a fraud claim cannot be based upon oral misrepresentations which directly contradict a specific and unambiguous provision of a written contract. In *Turner,* the plaintiffs sold their electronic thermometer business to the defendant after lengthy negotiations. At one point in the negotiations the defendant represented that it would use its best efforts to market the thermometer. (The plaintiffs were to receive a percentage of royalties as part of the consideration.) However, the final version of the written contract stated that the defendant "shall not be obligated to use its best efforts" to market the thermometer. *Turner,* 809 F.2d at 93. The plaintiff sued after the defendant failed to market the thermometer. The trial court directed a verdict in favor of the defendant on the breach of contract claim. A jury found for the plaintiff on the fraud claim and awarded $4 million in damages.

The Court of Appeals for the First Circuit, applying Massachusetts law, vacated the fraud verdict. The appeals court acknowledged that Massachusetts case law recognized competing interests of contractual certainty on the one hand and protecting innocent parties from fraud on the other hand. Protection of innocent parties was most justifiable when a party signed a contract with a clause generally stating the parties relied upon no outside representations when in fact a party did so rely, according to the Court. The Court was less sympathetic toward situations in which a party purportedly agreed to a specific provision which was unambiguously contradicted in the written language of the agreement:

> We have no doubt that the balance shifts when the party asserting fraud is not seeking to avoid an ambiguous or deceptive contractual device, but is trying to *reverse* the precise terms of an agreement....
>
> ... [A] contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable businesspeople—to pause. Moreover, if a jury is allowed to ignore contract provisions directly at odds

---

7. Moreover, there is no evidence, given the nature of a business in which termination clauses are a routine part of contracts between manufacturers and representatives, that Finn and Jay Regallis could reasonably have expected no conditions whatsoever would be placed upon Keller's purported three-year commitment.

with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore.... Contracts would become no more than presumptive statements of the parties' intentions, instead of legally enforceable agreements.... Thus, in weighing the competing interests, the Massachusetts Supreme Judicial Court undoubtedly would find that the threat to contractual certainty usually would outweigh the possible injustice of denying a claim of fraud.

. . . . . .

Certainly in this case, where both parties were experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue. While we do not condone misrepresentations in contract negotiations, we also reject the notion that courts or juries should rewrite a fully negotiated contractual agreement that so precisely sets out the rights and obligations of two sophisticated parties. We do not believe this rule of law awards undue protection against fraud claims. It means only that a knowledgeable buyer should not sign a contract that conflicts with his or her understanding of the agreement.

*Id.* at 96, 97 (emphasis in original) (footnote omitted).

*Turner* is a case which clearly favors Digital's position. However, dB Sales argues that a subsequent Massachusetts Supreme Judicial Court case, *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 563 N.E.2d 188 (1990), is more appropriate to the facts of this case and precludes summary judgment. The plaintiff in *McEvoy* was a small travel agency which provided air travel services to the defendant, a large international conglomerate. The arrangement existed for thirty years with no written contract. In 1980, the defendant proposed a more formal relationship whereby the defendant would make the plaintiff its exclusive travel agent and the

plaintiff would make several commitments necessary to accommodate the increased volume of business. The parties agreed that the arrangement would be a "long-term" contract, but during discussions no written contract was mentioned or envisioned. *McEvoy,* 408 Mass. at 707, 563 N.E.2d at 191. At considerable expense, the plaintiff moved its office to the defendant's building, signed a long-term lease on the office space, hired new personnel, purchased additional computers, and ceased efforts to obtain other clients. Two months into the new arrangement, the defendant sent the plaintiff a written contract which included a one-year term and a sixty-day termination clause. The plaintiff expressed his concerns to the defendant and was assured that the termination clause was "inoperative," "meaningless" and a mere technicality required by the company's law department. *Id.* The plaintiff signed the contract. At the same time the assurances were being given, the defendant was investigating the possibility of accommodating its travel needs elsewhere. After two renewals of the one-year contract, the defendant exercised the termination clause.

A jury returned a verdict in favor of the plaintiff on its fraud claim.[8] The Massachusetts Supreme Judicial Court affirmed, holding that "statements of present intention as to future conduct may be the basis for a fraud action if ... the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage." *Id.* at 709, 563 N.E.2d at 192. The Supreme Judicial Court distinguished *Turner* in two respects. First, it held that in *Turner* the alleged fraud took place during negotiations, while in *McEvoy* the alleged fraud took place not as part of negotiations but just prior to the signing of the contract. The Court apparently found more egregious a situation, as in *McEvoy*, where "in order to induce the plaintiffs to sign, [the defendant] pointed to a particular provision of the final contract and fraudulently promised that it would not invoke the provision." *Id.* at 711, 563 N.E.2d at 193. Second, it held that

---

**8.** The jury also returned a verdict in favor of the plaintiff on a breach of contract claim, but the trial court entered judgment notwithstanding the verdict in favor of the defendant on that claim. The plaintiff did not appeal the trial court's decision.

*Turner* rested largely on the court's finding that the written contract had been fully negotiated and represented the parties' complete and final understanding. "By contrast, the jury could have found in this case that the termination provision in the Norton–McEvoy contract was not mentioned during negotiations but rather had been inserted unilaterally by Norton." *Id.* at 712, 563 N.E.2d at 193.

The *McEvoy* court added:

We continue to believe that parties to contracts, whether experienced in business or not, should deal with each other honestly, and that a party should not be permitted to engage in fraud to induce the contract.... We therefore see no reason to create, as *Turner* suggests, a new rule or an exception to fit cases between sophisticated business enterprises involving contracts which have been induced by the fraud of a party.

*Id.* at 713, 563 N.E.2d at 194. Through the final quoted passage, the Supreme Judicial Court makes clear that knowingly false statements will not be immune from fraud claims merely because the duped party is considered a "sophisticated business enterprise."

dB Sales argues that under the reasoning in *McEvoy,* summary judgment is inappropriate for the fraud claim. This argument, while appealing at first glance, fails upon closer inspection. dB Sales correctly points out that the *McEvoy* court loosened what appeared to be a relatively tight rule in *Turner* that when parties are experienced in business, prior oral assertions cannot be used to contradict specific contradictory terms of a written contract. However, *McEvoy* also maintains the traditional fraud requirements of knowing misrepresentation and reasonable reliance on the alleged misrepresentation. Evidence in *McEvoy* supported a finding of intentional misrepresentation, as the defendant was investigating new opportunities at the same time it was assuring the plaintiff that the termination clause was void. Evidence also supported a finding of reasonable reliance, particularly "[i]n view of the longstanding relationship between the parties, and the commitment McEvoy was making to the expanded venture." *Id.*

The Court recognizes that *McEvoy* does not preclude a fraud claim merely because the unambiguous terms of the written contract contradict the alleged prior oral assertions. However, to establish a fraud claim dB Sales still must present evidence upon which a jury could reasonably find that each of the traditional elements of fraud has been established. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (summary judgment appropriate when nonmoving party fails to make a sufficient showing on essential element of case). As discussed more fully below, dB Sales' allegations of fraud fail to raise a genuine issue of material fact for two reasons: 1) there is no evidence upon which a reasonable jury could find that Keller's statements were knowingly false at the time he made them; and 2) there is no evidence upon which a reasonable jury could find that dB Sales' purported reliance upon Keller's statements was reasonable.

### 1. The "Knowingly False" Element

■ Under Massachusetts law, an intention not to perform as a basis for a claim of fraudulent inducement may not be inferred from the mere nonperformance of the promise. *McCartin v. Westlake,* 36 Mass.App.Ct. 221, 232 n. 11, 630 N.E.2d 283, 289 n. 11. The only evidence supporting dB Sales' assertion that Keller's statements were knowingly false is the fact that Digital's personal computer division, faced with a mandate to cut costs within a few months of execution of the contracts, elected to eliminate manufacturer's representatives. dB Sales argues that the timing of the decision suggests that Digital had no intention to lose money for two years, as Keller allegedly suggested.

dB Sales ignores evidence presented by Digital that business conditions changed between execution of the contract and exercise of the termination clause. Digital provides evidence that a major competitor cut its prices, forcing Digital to respond in kind. The unanticipated increase in losses prompted Digital to mandate a two percent reduction of overhead in selling the personal computers. *See* pages 1328–1329 *supra.* This, according to the uncontroverted testimony of

the national sales manager of Digital's retail home PC division, prompted Digital to decide to terminate its manufacturer's representatives. In short, dB Sales has presented no evidence supporting the notion that eliminating the manufacturer's representatives was a result of anything other than a business decision based largely upon events occurring *after* Keller made his alleged promises to dB Sales.[9]

### 2. The "Reasonable Reliance" Element

No reasonable jury could find that dB Sales both *actually* and *reasonably* relied upon Keller's assertions in entering into the contract. First, Finn's March 15 letter to Packard Bell—written six days after he signed the Digital contract[10]—raises a serious challenge to dB Sales' assertion that it actually anticipated an airtight three-year relationship with Digital. Had Packard Bell accepted the proposal in Finn's letter, dB Sales would have been faced with two contracts for exclusive representation. The explanation provided in dB Sales' brief that Finn's letter was merely a face-saving device proposing terms known to be unacceptable to Packard Bell is supported by no reference to Finn's deposition testimony and borders on disingenuous.

While there thus is a question whether dB Sales actually relied on Keller's alleged misrepresentations, there is no such question whether such reliance was reasonable. No reasonable jury, examining all of the evidence, could conclude that dB Sales reasonably relied upon Keller's purported statements. Summary judgment is therefore appropriate on the fraud claim.

A reasonableness inquiry involves analysis of a number of factors. First is a close look at the statements allegedly made by Keller. According to Finn's testimony, after acknowledging he was powerless to get the wording of the contract changed, Keller stated:

> [Y]ou're going to have the line at least three years.... *I would not have gone out and done all this work, bring in all these people, develop all these programs if I wasn't sure that Digital was committed to a long-term rep program.*

> · · · · ·

> [Y]es, not only do[es] [Digital] have the stomach [to sustain losses], but the plan is the willingness to lose money the first two years to gain market share and become a top tier player.

> ..... *I have a three-year contract with Digital and as long as I am there,* I will guarantee that you guys will be a part of the group.

(Finn depo. at 242, 244, 245) (emphasis added). Jay Regallis recalled the conversations as follows:

> ... [Keller's] presentation was that it was a three year contract, that *his contract was three years, that he was in it for the duration,* and that he needed us to help him be successful at retail.

(Jay Regallis depo. at 138) (emphasis added). In light of Keller's acknowledgment at the outset that he could not get the term of the contract changed, the alleged comments sound more like a pledge that dB Sales was in *Keller*'s plans than necessarily in Digital's plans. dB Sales knew it was dealing with a

---

**9.** In any event, dB Sales could not have reasonably believed that Keller controlled all of the business decisions of the corporation for which he was employed. The evidence indicates the elimination of manufacturer's representatives was triggered by orders from executives above Keller in the corporation. There is simply no evidence that Keller knew at the time he allegedly made the statements to dB Sales that developments would force elimination of manufacturer's representatives. If anything, the logical inferences lead in the opposite direction. Digital hired Keller from a competitor in November 1994 and allowed him to establish a nationwide system of representatives. The inferences tend to indicate Digital had no plans to eliminate the representatives within a few months—and to pull

the plug on the entire personal computer manufacturing division after a few more months. Perhaps a jury could have inferred such a sinister motive if Digital, after contracting with the representatives for a few months, terminated all of the agreements, went direct, and flourished in the industry without having to pay commission rates to its former representatives. Digital's abandonment of the retail PC market shortly thereafter is strong evidence that no such plot was at work.

**10.** As noted previously, the letter was written one day before Digital executed the contract creating the binding agreement.

large corporation entering a new field. Construing Keller's alleged promise as binding upon a corporation which was unwilling to put such a promise in writing was not reasonable.

Moreover, as explained in Section A, *supra*, Finn and Jay Regallis admitted that they knew at-will termination clauses were common in contracts between manufacturers and representatives. Yet they did not attempt to negotiate the clause out of the Digital contract. It was not reasonable for dB Sales to believe, notwithstanding the unchallenged presence of such a clause in the contract, that it had a three-year guarantee.[11]

Finally, dB Sales' assertion that it terminated a "lucrative contract" (Pl. brief at 15) with Packard Bell because of Keller's alleged misrepresentations is unsupported by the record. First, dB Sales was operating under no contract with Packard Bell. Second, the terms offered by Packard Bell would have made it difficult if not impossible for dB Sales to turn a profit in 1995.[12] Third, both dB Sales and Packard Bell acknowledged that continuation of their business relationship was in jeopardy, as dB Sales questioned whether it could accept the proposed cuts and Packard Bell considered eliminating manufacturer's representatives.

In concluding dB Sales has not established a fraud claim, the Court finds this case distinguishable from *McEvoy, supra*. In *McEvoy*, the court found that the plaintiff's reliance was reasonable "[i]n view of the long existing relationship between the parties." *Id.* at 713, 563 N.E.2d at 194. No such relationship existed in the instant case. Moreover, in *McEvoy* the plaintiff had already begun to perform at considerable expense when a written contract with a termination clause was presented to him. There was no partial performance prior to execution in the instant case. Finally, in *McEvoy* there was evidence that the defendant was seeking other arrangements at the same time it was assuring the plaintiff that the termination clause had no operative effect. There is no evidence in the instant case of such deceit.

In sum, dB Sales has not raised a genuine issue of material fact that, assuming it actually relied on Keller's alleged misrepresentations, such reliance would have been reasonable. This shortcoming, combined with the lack of evidence that Keller's alleged statements were knowingly false, makes summary judgment is appropriate on the fraud claim.

### C. Promissory Estoppel

Like fraud, promissory estoppel requires *reasonable* reliance on a promise which is intended to induce certain conduct. For reasons set forth in the preceding section, dB Sales has failed to raise a genuine issue of material fact that any reliance on Keller's alleged statements would have been reasonable. Summary judgment is therefore appropriate on the promissory estoppel claim.[13]

---

11. dB Sales argues that "industry practice should be irrelevant" because *McEvoy* declined to impose a more exacting standard upon sophisticated business persons claiming fraud. (Pl. brief at 12). The Court disagrees. Any party, whether or not "sophisticated," must prove *reasonable* reliance in order to show fraud. And a reasonableness inquiry involves what the contracting party knew or should have known with respect to the contents of the contract. Holding dB Sales responsible for the knowledge it has attained through twenty years in the industry is not tantamount to penalizing the company for being "sophisticated."

12. The record indicates dB Sales' net income in 1993 was $56,334.88 and its pre-tax income in 1994 was $109,390. (Def. Exhs. Q and W). Packard Bell's proposed cuts in commission rates would not have taken effect until 1995. Given the fact that Packard Bell provided rough-

ly half of dB Sales' total revenue, it appears turning a profit in 1995 would have been a challenge.

13. Although the disposition of the case does not require further analysis, the Court feels compelled to add a word about damages limitations which would have applied if the case would have survived summary judgment. The Court on page 1325–1326 *supra* quoted the contract's paragraph limiting damages "for any cause whatsoever" to the lesser of $1 million or the total commissions paid in the prior twelve months—in this case, $33,600. The limitations clause also stated that "in no event" would Digital be liable for lost profits. In the Court's view, dB Sales' assertion that the clause does not apply to the circumstances of this case is hopelessly weak. First, dB Sales argues that the paragraph was "not bargained for" because it was not discussed at the March 7 meeting. (Pl. brief at 17). The Court

## V. CONCLUSION

For the reasons set forth above, the motion of defendant Digital Equipment Corporation for summary judgment is granted. The Court shall issue a judgment entry contemporaneously with the publication of this memorandum opinion.

IT IS SO ORDERED.

notes that dB Sales, in successfully opposing Digital's motion to dismiss, was more than willing to embrace the choice of law provision of the contract, notwithstanding the lack of evidence it was "bargained for" or discussed. The argument simply holds no water.

Second, dB Sales argues that the clause "is likely to be misunderstood, given the surrounding language." (*Id.* at 18). The Court finds it difficult to misunderstand a phrase limiting liability "for any cause whatsoever." The fact that the clause adds one exception—negligence claims involving personal injury—reinforces the conclusion that *expressio unius est exclusio alterius.* Third, dB Sales argues that clauses limiting liability tend to be enforced only in cases in which it is difficult to ascertain actual damages. Given the fact that the Packard Bell was considering dropping manufacturer's representatives and that Digital ceased making Starion computers in early 1996, this would be such a case.

Finally, citing a 1928 lower court Massachusetts case and a 1978 Florida case, dB Sales argues "it is well settled" that a liquidated damages provision is enforceable only in the absence of fraud. Suffice it to say that in the utter absence of any evidence that the limitations clause was fraudulently induced (dB Sales acknowledges it was not even discussed), the Court need not address such authority.