**TRENT PARTNERS AND ASSOCIATES, INC.,**
Plaintiff,

v.

**DIGITAL EQUIPMENT CORP.,** Defendant.

**AB & T Sales Corp.,** Plaintiff,

v.

**Digital Equipment Corp.,** Defendant.

Nos. CIV. A. 97–10048–DPW, CIV. A. 97–10673–DPW.

United States District Court, D. Massachusetts.

Dec. 22, 1999.

have consolidated under the lead docket of *Trent Partners and Assoc., Inc. v. Digital Equipment Corp.*, 97–10048–DPW. The plaintiffs, Trent Partners and Associates, Inc. ("Trent") and AB & T Sales Corporation ("AB & T"), have filed for partial summary judgment as to their breach of contract claims and claims related to violations of Mass. Gen. Laws ch. 93A, § 11. The defendant, Digital Equipment Corporation ("Digital"), has filed for summary judgment as to all claims against it. For the reasons set forth more fully below, the plaintiffs' motion will be denied and the defendant's motion will be granted in part.

## I. BACKGROUND

These disputes arise out of identical Sales Representative Agreements ("the Agreements") entered into by Digital and nine [1] separate sales representatives, two of which are plaintiffs here, as a part of Digital's strategy to enter the personal computer market. In order to analyze the claims asserted by the plaintiffs here it is necessary to explore in some detail the circumstances leading up to the consummation of the Agreements.[2]

In the fall of 1994, Digital first decided to enter the retail personal home computer market with a line of computers called "Starion". (Def.'s AB & T SOF ¶ 1.) Initially, it sold these computers exclusively through two retail outlet stores, Sam's Club and CompUSA. (*Id.*) In November 1994, Digital hired Rodney Keller to help it increase sales of the Starion line and under his direction Digital initiated a program of employing independent sales representatives ("representatives") to aid marketing of the product line. (Def.'s AB & T SOF ¶ 4.)

By hiring such representatives Digital was essentially contracting out much of the

Richard K. Green, Peter A. Greenburg, Greenburg & Green, Rockville, MD, for plaintiffs.

Shepard M. Remis, John B. Daukas, Tammie C. Garner, Goodwin, Procter & Hoar, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Before me are cross motions for summary judgment in two related cases that I

---

1. Apparently there was a tenth sales representative, Schreyer Associates, that was retained by Digital but did not sign a similar written agreement. (AB & T's Resp. to Def.'s Statement of Facts ("SOF") ¶ 5(b).)

2. To the extent necessary, I will divide this discussion of the facts into sections dealing individually with each plaintiff. At the outset, I set out facts common to both plaintiffs.

marketing activity for the new product line to independent agents in several different geographic locations. (Deposition of Richard Tydings at 16, 24, Pl. Ex. 2.) Generally, such representatives present the line to the retail buyers, coordinate displays and training regarding the new product, and secure purchase orders from retail buyers. (*Id.* at 24.) Success in the latter duty of securing purchase orders is often determinative of the amount that a representative will be paid—its compensation being measured as a percentage of sales procured. (Decl. of Deaver Brown ¶ 10(a), Pl.'s Ex. 1.) Frequently, after some period of time, a manufacturer will decide to "go direct" with its product line, which entails substituting its own "in-house" marketing and sales force for the representatives. (Tydings Dep. at 66–67.)

I now turn to the specific circumstances surrounding the formation of each plaintiff's agreement with Digital.

### A. *AB & T Negotiations* [3]

In November 1994, Keller began investigating potential representatives for the task of marketing the Starion line. Richard Tydings, President of AB & T, learned of the opportunity to represent Digital and aggressively began to court Keller by the end of November. (Def.'s AB & T SOF ¶ 7.) Tydings' negotiations with Keller consisted of approximately three telephone conversations during which the general outline of the deal were discussed.

In the second conversation, Tydings told Keller that AB & T would be an attractive option for Digital because of AB & T's previous dealings with retail computer sales companies that Digital would undoubtedly wish to target. (Def.'s AB & T SOF ¶¶ 8–10.) According to Tydings, of particular interest to Keller was an account with Circuit City. Tydings claims that Keller indicated "it was critical ... [to] get a rep firm that knows Circuit City inside and out better than anybody else." [4] (Tydings Dep. at 158.) Tydings also contends that

> [Keller] told me that his number-one concern and his number-one criteria for the mid-Atlantic territory was my relationship—or whoever, but in particular AB & T's relationship with Circuit City. ... The number one account in the territory and the number one account in the nation was Circuit City and that's it.

(*Id.* at 164–65.) Keller made it clear during these negotiations that he had already initiated a dialogue with Circuit City, but nothing positive had come from those preliminary talks. (*Id.* at 168–172.) At the end of the second conversation, Keller stated that he would have to get back to Tydings after checking with Circuit City about AB & T's relationship with them. (*Id.* at 149–50.)

Tydings asserts that in addition to the discussions regarding Circuit City, during their second conversation Keller stated "we're making a three-year commitment to the reps. ...if you know anything about me and you know any of the Compaq reps, this whole thing will be a minimum of

---

**3.** The following rendition of communications between Keller and Richard Tydings, AB & T's President, as well as Keller and Trent's President, Stephen Trentacoste, is based primarily on deposition testimony of Tydings and Trentacoste. Keller's accounts of the conversations are much less clear and in most cases he has testified that he remembers few specifics from any conversations with Tydings or Trentacoste. I will primarily rely on the accounts made by Tydings and Trentacoste because the defendant has conceded most accounts in its D. Mass. R. 56.1 Statements of Material Facts and because Digital is the more comprehensive movant for summary judgment. When evaluating the plaintiffs'

limited Motion for Partial Summary Judgment, however, I will examine the evidence through a lens that appropriately takes into account the burdens and requirements of Fed. R.Civ.P. 56(c).

**4.** Keller stated in his deposition that he already had a significant relationship with Circuit City and that he merely was looking for "an organization that was near Circuit City Headquarters that could schedule meetings for us and manage the day-to-day operations for Circuit City." (Deposition of Rodney Keller at 27, Def.'s AB & T SOF, Ex. D.)

three years, somewhere between three and five years." (Tydings Dep. at 149.) Tydings then asked Keller if the three year commitment would be in the contract, to which Keller replied "I can't get anything like that past the attorneys at [Digital], but if you know me and you work with me, as long as I'm here, we'll be using reps and you can bet on a three to a five-year run with this." (*Id.* at 150.)

A few days later, during the first week of February 1995, Keller called again, this time to offer Tydings the account. (Tydings Dep. at 173.) According to Tydings, Keller told him that he had spoken to Circuit City and "not only had he gotten a very favorable review and recommendation on us, but he got the most favorable review and recommendation he'd received of any rep anywhere and that he wanted us to come on board." (*Id.* at 173.)

At that point, Keller allegedly stated that "he needed to get a program in front of Circuit City immediately and could we start working with him right away." (*Id.* at 173–74.) Tydings then began work on a Circuit City proposal for Digital, while he awaited a late February 1995 meeting in Massachusetts to finalize the deal. (*Id.* at 180–81.)

### B. *Trent Negotiations*

Trent, a New York company, began representing Digital in the New York area in the middle of 1994 as a representative for the defendant's line of printers. (Def.'s Trent SOF ¶ 7.) Stephen Trentacoste, the President and sole owner of Trent, discovered that Digital was soliciting the services of representatives for its new line of home computers. (*Id.* ¶ 8.)

Through the use of his printer contacts at Digital, Trentacoste was able to set up a meeting with Keller on January 8, 1995 in order to express his desire to represent Digital's Starion line. (*Id.* ¶ 10.) At that meeting, Trentacoste and Keller discussed several retail accounts that Digital was interested in pursuing in the New York area, particularly Nobody Beats the Wiz

and J & R. (Deposition of Stephen Trentacoste at 99–100, Def.'s Trent SOF, Ex. G.) After the January meeting, Trentacoste was very eager to close the deal with Digital, saying that he would have signed on with Digital immediately. (*Id.* at 102.)

On February 1, 1995 Keller called Trentacoste and offered him the position as a representative of the New York metropolitan area. (Def.'s Trent SOF ¶ 16.) Trentacoste expressed his enthusiasm and indicated he was willing to accept. (Trentacoste Dep. at 109–10.) No specific terms or conditions of the marketing relationship, including the length of the contract, were discussed at that time. (*Id.* at 111.) Instead, Keller invited Trentacoste to a meeting of the new representatives in Massachusetts later in February. (*Id.* at 109.) While awaiting the February meeting, Trentacoste and his colleagues at Trent initiated negotiations with Nobody Beats the Wiz, on behalf of Digital. (*Id.* at 114–16.)

### C. *The Westford Meeting*

On February 22–23, 1995, Digital held a meeting in Westford, Massachusetts with all of the new representatives including Trent and AB & T. At this meeting, Keller and others from Digital made presentations to the representatives concerning the Starion line and Digital's goals. (Def.'s Trent SOF ¶¶ 18–19.) Both Tydings and Trentacoste claim that Keller expressed Digital's commitment to a three year deal at this meeting. (Trentacoste Dep. at 126–27; Tydings Dep. at 212, 246–248.)

At the Westford meeting, Digital presented the representatives with individual written contracts to be signed by each of them and Digital. The Agreements were identical, consisting of seven pages and two attached exhibits which described the territory of the individual representative and the method of calculating commissions. (*See* Trent Sales Representative Agreement, Def.'s Trent SOF, Ex. J; AB & T Sales Representative Agreement, Def.'s AB & T SOF, Ex. I.) Paragraph 7 details

the representative's right to commissions, stating that the

> [r]epresentative shall be entitled to a commission for sales of Products to customers {within the Territory and Market} pursuant to accepted purchase orders submitted by Representative during the term of this Agreement ("Qualified Sales").

(*Id.* ¶ 7.) The "term" of the Agreement was defined as commencing on the date of the contract and terminating on the "Termination Date." (*See id.* ¶ 8.) In ¶ 9 of the Agreement the termination of the contract was defined as follows:

> *Termination:* This Agreement may be terminated at any time by either DIGITAL or Representative upon thirty (30) days advance written notice to the other. The date specified in such a notice as the termination date or, if no date is specified, that date that is thirty (30) days after the receipt of the notice shall be the "Termination Date"). [sic]

(*Id.* ¶ 9.) In addition, ¶ 12 of the Agreement limited damages recoverable against Digital to "THE LESSER OF ONE MILLION DOLLARS ($1,000,000) OR THE SUM OF THE COMMISSIONS PAID TO THE MANUFACTURER'S REPRESENTATIVE DURING THE PREVIOUS TWELVE (12) MONTHS." (*Id.* ¶ 12.) The Agreement did not contain any integration clause.

Despite the language in the Agreements, both Trent and AB & T contend they believed that they had a three year commitment from Digital based on oral representations made by Keller. Neither party, however, insisted that such a term be included in the Agreements. Trentacoste never asked for the three year term nor did he ask that the Termination Clause or any other part of the Agreement be delet-

ed or changed in any way. (Def.'s Trent SOF ¶ 30.) Tydings asked Keller during the Westford meeting "in a kidding fashion" if a three year commitment could be included in the Agreement to which Keller again responded that "there was no way in hell he was going to get anything like that past the legal, in house legal at Digital"; instead, Keller assured Tydings that "his commitment spoke for itself." (Tydings Dep. at 248.)

D. *The Life of the Agreements*

1. *AB & T's Activities*—In the months following the Weston meeting, AB & T continued its efforts to produce sales of the Starion line from retail outlets in its geographic territory. In addition, on Keller's insistence, Tydings provided to Digital a comprehensive profile of Circuit City's business needs compiled by AB & T. (Tydings Dep. at 492–93.) This data compilation included Circuit City's sales volume, their expected unit demand, as well as the range and selection of products they desired, and their profit margins.[5] (AB & T Complaint ¶ 22(b).)

Because of the importance to Digital of reaching an agreement with Circuit City, AB & T focused a great deal of their energy on that account. AB & T met with executives from Circuit City and attended several meetings with Circuit City and Digital in an attempt to produce an agreement. (Def.'s AB & T SOF ¶ 63.) Negotiations intensified during the summer of 1995, particularly in July as the two sides tried to meet Circuit City's needs for the upcoming fall selling season. (Tydings Dep. at 386–87.) AB & T provided some further technical support by shipping an evaluation unit to Circuit City so that it could examine the proposed product. (*Id.* at 387.) There was a final meeting in July which Tydings did not attend[6] after which

---

5. This material is the subject of AB & T's misappropriation of trade secrets claim.

6. There is a dispute as to why Tydings did not attend the final July meeting. Tydings contends that it is because he was out of the country, (Tydings Dep. at 387), while Digital

claims that Tydings was not invited because Circuit City requested that no representatives be present. (Def.'s AB & T SOF ¶ 63.) In its Complaint AB & T claims that after organizing the final meeting with Circuit City, Digital insisted that no representatives of AB & T

Keller called Tydings and said, "[I]t looks like we have a deal." *Id.*

2. *Trent's Activities*—In the meantime, Trent focused its activities on the three primary target accounts for the New York Metropolitan area: Nobody Beats the Wiz, J & R, and Rockwell. (Pl.'s SOF ¶ 50; Pl.'s SOF, Ex. 36.) On April 3, 1995, it sent Digital a summary of recent projections for these accounts as well as several purchase orders. (Pl.'s SOF, Ex. 36.) On April 12, 1995, Trentacoste sent Digital a memorandum informing it of the completion of detailing for Nobody Beats the Wiz and CompUSA. (Pl.'s SOF, Ex. 15.) On May 17, 1995, Digital announced the signing of J & R, one of Trent's primary accounts, as a product retailer. (Pl.'s SOF, Ex. 37.) Throughout the summer months, Trent continued to send Digital purchase orders and other projected purchase requirements from retailers in their area. (*See* Pl.'s SOF ¶¶ 54–55; Pl.'s SOF, Exs. 39–40.)

### E. *Digital's Termination of the Agreements*

Digital's Starion line of personal computers did not perform well in the initial few months of its existence. (Def.'s AB & T SOF ¶ 43.) Facing price reductions and significant competition from other manufacturers, Digital lowered the price of the Starion line in order to remain competitive. (*Id.*) These price reductions only served to reduce Digital's profitability further. (*Id.*) In June 1995, Digital formed a task force to determine whether it should remain in the retail personal computer market. (Def.'s AB & T SOF ¶ 44.)

Despite these problems, Digital's budget for fiscal year 1996 as of July 14, 1995 called for expenditures for the Starion line, including allocations for the independent representatives. (*See* Def.'s AB & T Ex. J.) By the third week of July, however, Digital's executives decided that the retail

personal computer division would have to cut administrative costs by 25% in light of the recent financial troubles. (Def.'s AB & T SOF ¶ 46.) Keller decided that the best way to cut expenditures was to terminate the contracts of the representatives which would reduce costs by the necessary amount through the elimination of $3.4 million in commissions for fiscal year 1996. (*Id.;* Pl.'s Ex. 20.) Digital has freely admitted that this decision was one made entirely for financial reasons in an effort to cut costs and not based on inadequate performance by the representatives. (Def.'s AB & T SOF ¶ 47.)

To implement this decision, Keller's staff immediately developed a draft letter of termination for the nine representatives. (*See* Pl.'s Ex. 22.) Notes to Keller on one of the draft letters advised that the letter should be dated July 31, 1995 because "with the new shipments going out in Aug/Sept. each day costs us some." (*Id.*) Keller faxed the termination letters to the representatives on August 1, 1995 which set the "Termination Date" for purposes of the Agreement at August 31, 1995. (*See* Pl.'s SOF, Ex. 3.)

On August 1, 1995, the same day that the termination letters were sent, Circuit City submitted projections for product needs for the fall season to Digital totaling 43,200 units for the remainder of 1995.[7] (Pl.'s SOF, Ex. 24.) During August, Digital attempted to find a way to provide Circuit City with the necessary units by the fall season despite the fact that Digital's projected output for the entire Starion line was approximately 55,000 units. (*See* Pl.'s SOF ¶¶ 36–39; Pl.'s SOF, Ex. 25.) On August 23, 1995 Digital hosted a meeting with Circuit City personnel which according to Keller "kicked off our relationship as a supplier/retailer relationship." (Keller Dep. at 151.) During the first week of September, Digital began

---

attend this meeting. (AB & T Complaint ¶ 27.)

7. According to the defendant, these projections were not "purchase orders" for purposes of the Agreements. (Keller Dep. at 149–50.)

making arrangements for announcing its new partnership with Circuit City and sending the initial shipment of Starion computers. (September 5 Draft Press Release, Pl.'s SOF, Ex. 30; Shipping Email, Pl.'s SOF, Ex. 31.) On September 21, 1995 Circuit City transmitted a finalized request for Starion computers and purchase orders.[8] (*See* Pl.'s SOF, Ex. 34.)

After receipt of the Termination Letter, Trent sent Digital a letter dated September 1, 1995 demanding commissions for purchase orders that were accepted by Digital but not sent during August. (Pl.'s SOF, Ex. 41.) Trent claims that it was only paid commissions for less than one-third of the purchase orders that were accepted by Digital during the term of the Agreement. (Pl.'s SOF ¶ 58.) Digital admits it paid AB & T no commissions at any point in their relationship. (Def.'s Resp. to Pl.'s SOF ¶ 47.)

### F. *Procedural History*

In the months after Digital terminated the Agreements, several of the representatives brought suit against it. One of the nine representatives, dB Sales, Inc., commenced an action in the United States Court for the Northern District of Ohio pressing some of the claims against Digital that are at issue here. *See dB Sales, Inc. v. Digital Equipment Corp.*, 951 F.Supp. 1322 (N.D.Ohio 1996). In that case, Judge Dowd granted a motion for summary judgment by Digital as to all claims there presented. *Id.* at 1324.

As noted above, this consolidated civil action is composed of two related cases brought individually by Trent and AB & T against Digital. Trent commenced its action against Digital here in the District of Massachusetts, while at roughly the same time, AB & T initiated its action in the District of Maryland. On February 20, 1997, Trent filed a motion to transfer its case to the District of Maryland, pursuant to 28 U.S.C. § 1404(a), which I denied on

March 6, 1997. Thereafter, on March 24, 1997, the District of Maryland transferred the AB & T case to this District under § 1404(a). The two cases were then consolidated; discovery and the instant motions for summary judgment followed.

### II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that has the "potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina– Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (citations omitted).

The moving party has the initial burden to present evidence showing the lack of a factual dispute as to material issues raised in the pleadings. *FDIC v. Roldan Fonseca*, 795 F.2d 1102, 1105 (1st Cir.1986). Thereafter, the burden shifts to the nonmoving party to go beyond the pleadings in order to demonstrate specific facts showing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### III. CHOICE OF LAW

Before addressing the substantive claims before me, it is necessary to determine which state's law governs the nonfederal claims presented by AB & T and Trent. Generally, when confronting a choice of law question in a diversity case, a

---

**8.** Digital claims that this is the first purchase order, the plaintiffs submit that it is merely a

finalized version.

court must look to the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). For the claims brought by Trent this simply means that the choice of law rules of this forum, Massachusetts, apply.[9]

■ Where, however, there has been a transfer of a case pursuant to 28 U.S.C. § 1404, the transferee court must apply the law of the transferor forum. *Ferens v. John Deere Co.*, 494 U.S. 516, 523, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). In other words, a transfer pursuant to § 1404(a) does not change the law applicable to a diversity case. *Id.* Thus, I must address the present choice of law issues, pertaining to the AB & T claims, through the use of Maryland choice of law principles.

■ The first step in any choice of law analysis is to characterize the claims involved. *Pen Coal Corp. v. William H. McGee and Co., Inc.*, 903 F.Supp. 980, 983 (S.D.W.Va.1995). There are a total of eight counts in AB & T's Complaint filed in the District of Maryland. Some of the claims asserted under these counts sound in contract, while others raise tort law issues, there is also one federal law claim. (*See generally* AB & T Complaint.) In order to address effectively the myriad of issues here, it will be necessary to examine each claim separately under Maryland conflict of law rules.[10]

### A. Contract-based Claims

■ Count VII of the AB & T Complaint deals with breach of contract and promissory estoppel issues. The Agreement contains a choice of law provision which indicates that Massachusetts law should govern the interpretation, construction and performance of the contract. (Sales Agreement ¶ 13.) Under Maryland law, the choice of law provision in a contract will be honored unless the chosen state law has no substantial relationship to the parties or the transaction and there is no reasonable basis for the parties' choice; or unless the application of the chosen law violates a fundamental public policy of a state with a materially greater interest in the case than the chosen state. *Kronovet v. Lipchin*, 288 Md. 30, 43–44, 415 A.2d 1096 (1980) (citing Restatement (Second) of Conflict of Laws § 187 (1971); *see also, American Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 572, 659 A.2d 1295 (1995).

■ In *Kronovet v. Lipchin*, 288 Md. 30, 415 A.2d 1096 (1980), the Maryland Court of Appeals found that a contractual choice of law provision authorizing the contract to be interpreted pursuant to Maryland law was enforceable despite the fact that the contract was negotiated and made in New York, was to be performed in New York, and one of the parties resided in New York. *Id.* at 45, 415 A.2d 1096. The court reasoned that the presence of the security interest and the residence of the other party in Maryland were "sufficiently

9. For purposes of the state law issues raised by Trent, both parties appear to agree that Massachusetts law should govern. As discussed infra, the Agreement contains a provision stating that it should be governed by and interpreted under Massachusetts law, (Sales Agreement ¶ 13), and all state law claims have been made and briefed under the law of Massachusetts.

10. To the extent that it becomes necessary to evaluate different claims under the law of different states, this choice of law analysis implicates the doctrine of depecage. As the First Circuit has stated "depecage erects the framework under which different issues in a single case, arising out of a common nucleus of operative facts, may be decided according to the substantive law of different states." *Putnam Resources v. Pateman*, 958 F.2d 448, 465 (1st Cir.1992). While it seems that the Maryland Court of Appeals has not endorsed the concept by name, in some cases state and federal courts applying Maryland law have implicitly endorsed the use of laws of different states to address different claims under Maryland conflicts of law analysis. *See e.g., National Glass, Inc. v. J.C. Penney Properties, Inc.*, 336 Md. 606, 610–15, 650 A.2d 246 (1994); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir.1986).

substantial contacts." *Id.* at 46, 415 A.2d 1096.

Here, Massachusetts undoubtedly has a relationship to the parties and the transaction sufficient to satisfy the standard in *Kronovet. See id.* at 44–46, 415 A.2d 1096. Digital's headquarters as well as their production facilities are located in Massachusetts, substantial negotiation that led to the parties entering into the Agreements occurred at the meeting in Westford, Massachusetts on February 22–23, 1995. Based on these factors, it appears clear that Massachusetts has "sufficiently substantial contacts" with the parties and transaction to justify the choice of law. *See Kronovet,* 288 Md. at 46, 415 A.2d 1096.

Maryland law also requires that the law of the chosen state not be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue. *Id.* at 46, 415 A.2d 1096 (citations omitted). First, as indicated above, it is not clear that Maryland has a materially greater interest than Massachusetts in the determination of this issue. Even if Maryland were to have a greater interest, the adoption of Massachusetts law here does not contravene a fundamental policy of Maryland.

In most cases the "fundamental policies" recognized by the Maryland Court of Appeals have been ones expressed in state statutes that clearly indicate the will of the Maryland legislature. *See National Glass, Inc. v. J.C. Penney Properties, Inc.,* 336 Md. 606, 612–13, 650 A.2d 246 (1994) (Maryland statute explicitly states that waiver of mechanic's lien in contract is "against public policy of this state"); *Bethlehem Steel v. G.C. Zarnas & Co.,* 304 Md. 183, 190, 498 A.2d 605 (1985) (Maryland statute explicitly states that indemnity clause in construction contract is "against public

policy"). The Maryland court has made clear that simply because Maryland law is dissimilar to the law of another jurisdiction is not enough to render that law violative of a fundamental policy. *National Glass, Inc.,* 336 Md. at 612, 650 A.2d 246. I have found no statute or other expression of Maryland law that indicates Massachusetts contract law would conflict with a "fundamental policy" of Maryland.

### B. *Tort-based Claims*

■ Counts I, III, V, VI and VIII of the AB & T Complaint address claims that are unambiguously tort related.[11] In contrast to the current trend in tort cases, the Maryland Court of Appeals has refused to embrace the "significant contacts test" advocated by the Restatement (Second) of Conflict of Laws § 145 and instead has adhered to the traditional *lex loci delicti* rule. *Hauch v. Connor,* 295 Md. 120, 123, 453 A.2d 1207 (1983). *Lex loci delicti* requires that a tort action be governed by the substantive law of the state where the tort was committed. *Id.* In Maryland, the "state where the tort was committed" has been found to mean the state where the wrong was inflicted not the state where the allegedly wrongful act took place. *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 511 (4th Cir.1986); *First Federal Savings and Loan Ass'n of Brainerd v. Equitable Bank,* 1988 WL 167703 *4 (D.Md. 1988); *Uppgren v. Executive Aviation Services, Inc.,* 326 F.Supp. 709, 711 (D.Md. 1971). This rule is often easy to apply in cases involving automobile accidents or assault, but it creates conceptual problems when the injury is less tangible. Courts applying this principle in the context of financial injury have used different rationales to determine the place of injury. *See First Federal,* 1988 WL 167703 at *4 (place of financial injury is not location of plaintiff's business, but of plaintiff's funds that were misappropriated); *Richardson*

---

11. Count I—"Common Law Fraud"; Count III—"Tortious Interference with Prospective Advantage"; Count V—"Theft of Trade Secrets and Misappropriation of Proprietary In-

formation"; Count VI—"Theft of Trade Secrets under Mass. Gen. Laws ch. 93, § 42"; Count VIII—"Negligent Misrepresentation".

*v. Nationwide Mortgage Corp.*, 1985 WL 9133 *9 (D.Md.1985) (place of injury in fraudulent misrepresentation mortgage case was situs of the home subject to mortgage not state where mortgage contract was signed).

■ In this case, it appears that the appropriate place to be identified with the infliction of the alleged injury against AB & T is Maryland. While many of the alleged misrepresentations or other tortious activities took place in Massachusetts, as well as over the telephone in any number of places, the effect of the injury, as AB & T describes it, is on their business reputation as well as on the financial well-being of their business. These injuries to AB & T must be seen as occurring at the location of their business which is Montgomery County, Maryland. (AB & T Complaint ¶ 5.) Thus, for purposes of the plainly tort-based causes of action, Maryland law must apply.[12]

### C. Mass. Gen. Laws ch. 93A, § 11

The final claim that must be addressed, put forth by AB & T in Count IV of its Complaint, is alleged "Unfair Competition and Deceptive Acts and Practices" by Digital in violation of Mass. Gen. Laws ch. 93A, § 11 ("Chapter 93A"). (*See* AB & T Complaint ¶ 92–99.) This cause of action may only be properly before me if Massachusetts law applies to the issues underlying the claim. If Maryland law applies, Count IV must be dismissed because this cause of action is based on Massachusetts statutory law. The question of how to characterize a claim under Chapter 93A is not unknown to this Circuit. *See e.g., Crellin Technologies, Inc. v. Equipment-*

*lease Corp.*, 18 F.3d 1 (1st Cir.1994); *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.*, 986 F.2d 607 (1st Cir.1993); *Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365 (D.Mass.1983); *see also, Worldwide Commodities, Inc. v. J. Amicone Co., Inc.*, 36 Mass.App.Ct. 304, 630 N.E.2d 615 (1994).

In *Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365 (D.Mass. 1983), the court proposed that every Chapter 93A claim be viewed as a tort action for choice of law purposes. *Id.* at 1371. Subsequently, in *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.*, 986 F.2d 607 (1st Cir.1993), the First Circuit squarely addressed the holding in *Qantel*, explaining that a blanket requirement that all Chapter 93A claims be considered tort-based for choice of law purposes appeared to "exalt pleading form over fact-related substance" and was not advisable. *Id.* at 610. In *Northeast Data Systems*, the Court analyzed the facts underlying the Chapter 93A claims and determined that all but one of them were based on violations of the contract and were thus contract issues for choice of law purposes. *Id.* at 609–610. The remaining claim rested on allegations of fraud, not breach of contract, and was therefore a tort claim under a choice of law analysis. *Id.* at 611.

In *Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1 (1st Cir. 1994), the First Circuit revisited this issue and again declined to adopt a uniform approach but instead endorsed a fact intensive analysis, pursuant to which

**12.** The plaintiffs argue that Massachusetts law should apply to all claims brought against Digital based on the choice of law provision in the Agreement, and the fact that the contract disputes are at the core of all claims. This analysis does not comport with·Maryland law or the words of the Agreement. While Maryland courts have consistently held that parties may choose the law that will govern their contractual transaction, this deference to the contract's terms has been confined to

issues relating to contractual rights and duties. *See Kronovet v. Lipchin*, 288 Md. 30, 44, 415 A.2d 1096 (1980) (citing Restatement (Second) Conflict of Laws § 187). In addition, the choice of law provision in this contract merely provides that the Agreement itself shall be "governed and construed" under Massachusetts law, *not* that all claims or disputes arising from the Agreement should be settled under Massachusetts law. (*See* Sales Agreement ¶ 13.)

it determined that the Chapter 93A claims at issue should properly be considered tort-based. *Id.* at 11–13. Because the "actionable conduct" involved resembled the tort of fraudulent misrepresentation, the court held that the Chapter 93A claim should be viewed as a tort claim under a conflict of laws analysis. *Id.* at 12.

In this case, the plaintiff's Chapter 93A claims appear to sound primarily in tort rather than contract. (*See* AB & T Complaint ¶¶ 92–99.) The focus of these claims is on alleged false representations and other fraudulent behavior by Digital. (AB & T Complaint ¶¶ 93(b), 94–96.) As the First Circuit found in *Crellin Technologies,* Chapter 93A claims that resemble the tort of fraudulent misrepresentation should be considered "under the tort rubric for purposes of our choice-of-law assessment." 18 F.3d at 12. Thus, to the extent that AB & T's Chapter 93A claims are based on tort concepts such as fraud or tortious interference with business relations, these claims must be seen as tort-based and thus barred from consideration as claims brought under Massachusetts law.[13]

There is one narrow, fairly undeveloped portion of AB & T's Chapter 93A claim that appears based on a breach of contract theory. (AB & T Complaint ¶¶ 92–93.) In its moving papers, AB & T clarifies this claim, arguing that Digital violated Chapter 93A by virtue of its bad faith termination of the at-will employment contract. (*See* Pl.'s Opp. to Def.'s Mot. Summ. J. at 22.) In this way, that narrow aspect of the Chapter 93A claim is merely a more " 'serious' or 'rascal-like' breach of contract" claim which should fall under the parties' agreed choice of law for contract related disputes. *See Northeast Data Systems,* 986 F.2d at 610.

## IV. BREACH OF CONTRACT CLAIMS

### A. *Interpretation of The Agreements*

Before evaluating issues of breach of contract raised by the plaintiff, it is necessary to determine what duties and rights are created by the Agreements. The interpretation of a contract under Massachusetts law is "ordinarily a question of law for the court." *Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d 990, 993 (1st Cir.1992) (quoting *Edmonds v. United States,* 642 F.2d 877, 881 (1st Cir.1981) (citations omitted)). The question of interpretation is only a matter for the jury when the terms of the contract are ambiguous. *Id.* In Massachusetts the issue of ambiguity must be closely examined, such that if the contract "is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms.". *Affiliated FM Ins. Co. v. Constitution Reins. Corp.,* 416 Mass. 839, 842, 626 N.E.2d 878 (1994)(quoting *Keating v. Stadium Management Corp.,* 24 Mass.App.Ct. 246, 249, 508 N.E.2d 121 (1987)). If, however, the contract is found to be an integrated, unambiguous document, the Massachusetts parole evidence rule states that "[e]vidence of prior or contemporaneous oral agreements cannot be admitted to vary or modify [its] terms . . . ." *Dwek,* 970 F.2d at 993.

In the absence of convincing evidence to the contrary, the question of whether an agreement is integrated—a complete description of the parties' agreement—can normally be inferred from a contract that is comprehensive and specific. *Robert Indus., Inc. v. Spence,* 362 Mass. 751, 754, 291 N.E.2d 407 (1973); *see also, Gregory v. Raytheon Serv. Co.,* 27 Mass.App.Ct. 1170, 1171, 540 N.E.2d 694 (1989) (integration uncontroverted by evidence). If there is a question concerning the com-

---

**13.** Of course such claims could be considered under any applicable Maryland tort law; however, Maryland apparently does not have a statutory provision analogous to Chapter 93A.

pleteness of the contract, a court must look to "the intention of the parties on which proof could be received ranging beyond the writing proper." *Antonellis v. Northgate Construction Corp.*, 362 Mass. 847, 849, 291 N.E.2d 626 (1973); *see also, Gregory*, 27 Mass.App.Ct. at 1171, 540 N.E.2d 694.

■ The Agreements signed by Digital and the nine representatives consist of seven pages and two attached, one-page exhibits. (*See generally*, Sales Agreement.) They describe in detail the territory covered, (*id.* ¶ 1 Ex. A), the representatives' warranties and responsibilities, (*id.* ¶¶ 2–3), Digital's responsibilities, (*id.* ¶ 4), the representatives' status as independent contractors, (*id.* ¶ 5), the sales procedures to be followed by both parties, (*id.* ¶ 6), the method of obtaining and calculating commissions, (*id.* ¶ 7, Ex. B), the term of the contract and the method of terminating it, (*id.* ¶¶ 8–9), as well as issue of indemnification, confidentiality, assignment of rights, and availability of remedies. (*Id.* ¶¶ 10–13.)

In addition, as in *Robert Indus. Inc. v. Spence*, 362 Mass. 751, 291 N.E.2d 407 (1973), the facts before me indicate that both parties acted in a way that demonstrated their intent that the Agreements would govern their relationship. 362 Mass. at 754, 291 N.E.2d 407 (fact that plaintiff pointed out typographical errors and disputed certain language in contract before signing it shows intent to be bound by writing). With respect to AB & T, Tydings twice asked Keller if the three year commitment would be included in the contract, (Tydings Dep. at 150, 248), while also pointing out some typographical errors that needed correction. (Tydings Dep. at 250–51.) By contrast, Trentacoste did not have any discussions whatsoever with Keller regarding additional terms that could constitute another facet of the agreement. Thus, with respect to Trent, the only oral representations that it could argue would modify the Agreement would be the statements of Keller and other Digital personnel at the Westford meeting discussing the future of the Starion product line. (*See* Trentacoste Dep. at 124–127.) These types of general remarks in a group setting cannot be considered an oral undertaking to be incorporated into the Agreements. *See Gregory*, 27 Mass.App. Ct. at 1171, 540 N.E.2d 694. Thus, because it appears clear that the Agreement was intended to be integrated and its language is unambiguous with respect to its "term", any oral representations made by the defendant here would be superceded by the written agreement. *See Buker v. National Management Corp.*, 16 Mass. App.Ct. 36, 42, 448 N.E.2d 1299 (1983) (citing *Kidder v. Greenman*, 283 Mass. 601, 609, 187 N.E. 42 (1933)).

■ Even if there were a genuine factual question regarding integration, the plain language of the Agreements allows for termination upon 30 days notice. As the case-law indicates, even where a contract is ambiguous, extrinsic evidence may only be introduced "for the purpose of elucidating, but not of contradicting or changing its terms." *Affiliated FM Ins. Co. v. Constitution Reinsurance Corp.*, 416 Mass. 839, 842, 626 N.E.2d 878 (1994) (citations omitted). Similarly, evidence of industry custom and usage is relevant to contract interpretation, even in the absence of ambiguity,[14] *A.J. Cunningham Packing Corp. v. Florence Beef Co.*, 785 F.2d 348, 351 (1st Cir.1986); however, this evidence must be construed, where possible, as consistent with the terms of the contract and if any inconsistency is found the express terms must control. *Cf.* Mass. Gen. Laws ch. 106, § 1–205(4).

Here the 30 day termination provision is clear and unambiguous, thus any purport-

---

**14.** In light of the holding in *Florence Beef* and Mass. Gen. Laws ch. 106, § 1–205(4), I will deny the defendant's motion to strike the affidavit of Deaver Brown. I thus consider the evidence of trade usage, but do so in a manner consistent with the terms of the Agreements. *See* Mass. Gen. Laws ch. 106, § 1–205(4).

ed oral modifications to it are inadmissable. *Den Norske Bank AS v. First National Bank of Boston,* 75 F.3d 49, 52 (1st Cir.1996); *Dwek,* 970 F.2d at 993. In addition, the evidence of trade and usage before me indicates that these types of termination clauses are frequently used in the sales representative industry. (*See* Decl. of Brown ¶ 18.) While the plaintiffs offer evidence to explain why, when and how these termination clauses are often used by employers, I find this information has no bearing on my interpretation of the Agreements. Nor does such evidence convince me to interpret the termination clause as anything but what the clear language indicates it to be: an at-will, without cause termination provision. *See Constitution Reins. Corp.,* 416 Mass. at 845–46, 626 N.E.2d 878.

### B. *Commissions Due Under Contract*

■ Apart from their claims for damages from bad faith termination of the Agreements and damages under tort theories, both AB & T and Trent claim that they are entitled to commissions under the terms of the Agreements as written and terminated by Digital. This portion of the parties' dispute centers on the contract language dealing with commissions. Digital contends that representatives are only entitled to commissions for purchase orders that are actually shipped before the date of termination. (Def.'s Opp. to Trent's Mot. for Partial Summ. J. at 5.) The plaintiffs assert that they are entitled to commissions for all orders that are submitted by them and accepted by Digital before the termination date of the contract. (Pl.'s Mot. for Partial Summ. J. at 12.)

Paragraph 7 of the Agreement sets out the rights of representatives to commissions, in addition Exhibit B to the Agreement more fully describes the method of calculating that commission. (*See* Sales Agreement ¶ 7, Ex. B.) As mentioned above, the section provides in part that

Representative shall be entitled to a commission for sales of Products to customers {within the Territory and Market} pursuant to accepted purchase orders submitted by Representative during the term of this Agreement ("Qualified Sales"), in accordance with the following terms and conditions.

(Sales Agreement ¶ 7.) Paragraph 7 goes on to describe generally how commissions are to be calculated, (*id.* ¶ 7(A)), limitations on receiving commissions if a customer fails to pay or products are returned for credit, (*id.* ¶ 7(B), (D)), responsibilities of Digital in reporting commission information monthly, (*id.* ¶ 7(C)), and the representative's right to commission in the event of termination. (*Id.* ¶ 7(E).) The latter clause states

Representative shall be entitled to receive all commissions due in accordance with the terms of this Agreement; provided, however, that Representative shall not be entitled to any commission for sales arising from purchase orders *delivered to DIGITAL after the "Termination Date"* (as defined below).

(*Id.* (emphasis added))

Given the express language of the Agreements, it is clear that representatives are entitled to commissions for all purchase orders that are delivered to and accepted by Digital before the termination date.[15] In support of its contention that representatives are not entitled to commissions if the products are not shipped before termination, Digital cites to a clause in the contract that states that the representative "shall be entitled to receive a commission from DIGITAL on Qualified Sales of the "Net Invoice Price." (Sales Agreement ¶ 7(A).) For purposes of the Agreements, Digital correctly points out

---

15. In opposing this interpretation, Digital points to its "complete discretion" to accept or reject purchase orders submitted by the representatives. (Sales Agreement ¶ 6(A).) This reading of the Agreement is sound, but does not affect the interpretation of the commission provisions, because representatives are only entitled to commissions on accepted purchase orders.

that "net invoice price" is not determined until the products are shipped; however, this language merely describes the method of calculating and paying commissions instead of dictating when a representative becomes entitled to the commissions. (See id.) Allowing Digital to wait until the product is invoiced before paying the commission is a practical way to ensure that, if a customer backs out or alters its order, Digital can correctly reduce the commission as required in the contract. This method of calculation, however, does not alter a representative's entitlement to a commission upon termination. Paragraph 7(E) contains additional specific provisions for the payment of commissions upon termination of the Agreement. This section limits commissions upon termination only to the extent that representatives are not entitled to commissions on purchase orders delivered after the termination date. (Sales Agreement ¶ 7(E).) If the parties wished to alter the commission procedures further in the event of termination they could have done so.

Thus, to the extent that any commissions are owed to the plaintiffs for purchase orders [16] submitted and accepted before the termination date, they must be paid.[17]

### C. Implied Covenant of Good Faith and Fair Dealing

■ Under Massachusetts law, "an employer may not in every instance termi-nate without liability an employment contract terminable at will." Cort v. Bristol–Myers Co., 385 Mass. 300, 303, 431 N.E.2d 908 (1982). The implied covenant of good faith and fair dealing provides protection to employees-at-will [18] in situations where the purpose of the termination was to deprive the employee of an identifiable, future benefit due for particular past service.

Turning to the litigation before me, I will deny the motions for summary judgment by all parties on this claim.

■ 1. AB & T [19]—Genuine issues of material fact exist as to both whether Digital acted in good faith or with good cause and whether past service entitled AB & T to a future, identifiable benefit.

a. Good Faith and Good Cause—The Court in Fortune v. National Cash Register Co., 373 Mass. 96, 104–05, 364 N.E.2d 1251 (1977), articulated factual scenarios that warrant a finding of a breach of the covenant of good faith:

> Where the principal seeks to deprive the agent of all compensation by terminating the contractual relationship when the agent is on the brink of successfully completing the sale, the principal has acted in bad faith and the ensuing transaction between the principal and the buyer is to be regarded as having been

---

**16.** There appears also to be a dispute as to what exactly constitutes a "purchase order". As the issue is not fully briefed by the parties, I shall leave this question for another day.

**17.** Of course the provisions of the Agreement relating to the calculation of these commissions still apply. Thus, commissions need not be paid until the goods are shipped and any final adjustment of the amount of the order has been made.

**18.** While referring to case law dealing with employees-at-will, I recognize of course, that these cases deal with independent contractors at will. For the most part, there is no material distinction in the relevant case law regarding these different agency relationships. But see n. 26.

**19.** At the outset, I note Digital argues that AB & T cannot assert a claim for damages because of the damages limitation clause in the sales representative agreement. (Agreement ¶ 12, Pl.'s Ex. 2.) The general rule appears to be that damage limitation clauses are enforceable unless they are unconscionable or against public policy. See Saey v. Xerox Corp., 31 F.Supp.2d 692, 700 (E.D.Mo.1998) (Missouri and New York law); Nahra v. Honeywell, Inc., 892 F.Supp. 962, 969–70 (N.D.Ohio 1995) (Ohio law). I find that the damages limitation clause may be unenforceable in this case as to this claim because as the court in Cort v. Bristol–Myers Co., 385 Mass. 300, 303, 431 N.E.2d 908 (1982), noted a bad faith breach of the implied covenant of good faith and fair dealing is contrary to public policy.

accomplished by the agent. The same result obtains where the principal attempts to deprive the agent of any portion of a commission due the agent.

In *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21 (1981) ("Gram I"), the Court held that a termination would be deemed without "good cause" if "a good faith belief that his firing was justified for business reasons" did not exist. *Id.* at 670, 429 N.E.2d 21.

The evidence permits the finding that Digital acted with the intention of denying AB & T the commission on a sale that was on the brink of completion. Evidence exists that shows the following.

AB & T was hired in part to help Digital reach an agreement with Circuit City. (*See e.g.*, Tydings Dep. at 149–50, 158, 164–65, 173–74.) In furtherance of this objective, AB & T scheduled meetings with Circuit City, (Def.'s AB & T SOF ¶ 63), furnished technical support during the negotiations, (Tydings Dep. at 387), and provided Digital with a data compilation containing detailed information about Circuit City's personal computer needs. (*Id.* at 492–93.) After performing these services, Keller called Tydings on approximately July 24, 1995 to announce that it "looks like we have a deal" with Circuit City. (*Id.* at 387.) About a week later, on August 1, 1995, Digital sent out a letter notifying AB & T that Digital was terminating AB & T as a sales representative. (Pl.'s SOF, Ex. 3.) On the same day that the letter was sent out, Circuit City notified Digital that Circuit City expected to buy 43,200 units. (Pl.'s SOF ¶ 35; Pl.'s SOF, Ex. 24.) Furthermore, on a draft of the August 1 letter, a handwritten note by Keller states, "dated 7/31/95—with the above shipments going out in Aug/Sept each day costs us some." (Pl.'s SOF, Ex. 12.) This evidence warrants a finding that Digital acted in bad faith.

On the other hand, evidence exists permitting the inference that Digital did not act in bad faith or without "good cause."

The *Fortune* court permits an employer to act in its own business interest:

[w]e do not question the general principles that an employer is entitled to be motivated by and to serve its own legitimate business interests; that an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world; and that an employer needs flexibility in the face of changing circumstances.

*Id.* at 101–02, 364 N.E.2d 1251; *see also Maddaloni v. Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 882, 438 N.E.2d 351 (1982) (holding by implication that jurors could have found discharge because of poor profits was legitimate business reason).

In this case, evidence exists that the Starion computer line was incurring losses. (Keller Dep. 105, Def.'s Ex. D.) Bernhard Auer, the worldwide general manager of Digital's Personal Computer Business Unit, responded by ordering the retail PC division to cut overhead costs by twenty-five percent. (Keller Dep. 58, Def.'s Ex. D.) After considering various possibilities, Keller determined the only way to achieve the necessary cuts was to terminate the sales representatives. (Keller Dep. 58–60, Def.'s Ex. D.) Whether Digital was acting in good faith simply to advance legitimate business interests or in bad faith or without "good cause" is a matter for the jury to decide.

■ b. *Identifiable, Future Benefit*— In *Fortune v. National Cash Register Co.*, 373 Mass. 96, 105, 364 N.E.2d 1251 (1977), the Court stated that when a principal seeks to deprive an agent of compensation by terminating the agent on the brink of a sale, the agent is viewed to have completed the sale and is entitled to the benefits. In *Gerald Rosen Co. v. International Tel. & Tel. Co.*, 16 Mass.App.Ct. 929, 929, 450 N.E.2d 189 (1983), the Court held

the plaintiff here has been paid the commissions on the orders it took, and the fact that its efforts may have augmented the prospect for future orders does not

bring its situation within the ambit of *Fortune v. National Cash Register Co.* . . . or of the Gram case. . . . [c]ases have not extended the concept to cover a generalized expectation of future orders in types, quantities, and sums not known at the time of termination.

 The present case exists in the grey area between the principles set forth in *Fortune* and *Gerald Rosen Co.* On the one hand, a jury could find that by September 1, 1995,[20] the effective date of AB & T's termination, Circuit City and Digital had both committed to the deal. For instance, even Keller indicated that the August 23, 1995 meeting between Digital and Circuit City kicked off their supplier/retailer relationship. (Keller Dep. 151, Pl.'s SOF Ex. 7.) Furthermore, a jury could find that the number of units was relatively clearly defined.[21] On August 1, 1995, Circuit City indicated it wanted 43,200 units. (Pl.'s SOF ¶ 35; Pl.'s SOF Ex. 24.) Digital responded with evaluations of its capabilities. (Pl.'s SOF ¶¶ 36–39.) In the end, Circuit City purchased approximately 34,000 units. (Pl.'s SOF Ex. 34.)

On the other hand, the jury may find Digital, acting in good faith, did not for all intents and purposes complete the sale to Circuit City before September 1, 1995. For instance, the purchase orders were not finalized until September 21, 1995.[22] (Pl.'s SOF ¶ 45.) Determining whether the Circuit City sale was essentially completed is an issue for the jury.

2. *Trent*—Trent asserts three bases for its breach of the implied covenant of good faith and fair dealing claim: (1) Trent facilitated relations with Nobody Beats the Wiz, J & R, and Rockwell, (2) Trent contributed uncompensated past services by detailing various purchasers, (3) Digital had accepted four purchase orders prior to August 31, 1995 that were not shipped until after August 31, 1995. Bases one and two are not sufficient for a claim for a breach of the implied covenant, but basis three could be.

 Massachusetts law is clear that mere, general facilitation of customer relations does not form the basis for a claim for a breach of the covenant of good faith and fair dealing. *See Gerald Rosen Co. v. International Tel. & Tel. Co.*, 16 Mass. App.Ct. 929, 929, 450 N.E.2d 189 (1983) (denying salesman with thirteen years experience claim based on generalized expec-

---

**20.** The parties dispute the plaintiffs' termination date. The letters terminating AB & T and Trent indicate each will be terminated on August 31, 1995. (Pl.'s SOF Exs. 3–4.) These letters were not received until August 2, 1995. (Pl.'s SOF ¶¶ 3–4.) The sales representative agreements state in § 9:

> This agreement may be terminated at any time by either DIGITAL or Representative upon thirty (30) days advance written notice to the other. The date specified in such a notice as the termination date or, if no date is specified, that date that is thirty (30) days after the receipt of the notice shall be the "Termination Date") [sic].

(Pl.'s SOF Exs. 1–2.) AB & T and Trent are entitled to thirty days advance written notice. Digital suggests that the thirty-day period may begin running prior to AB & T's and Trent's receipt of the notice. (Digital Opp. to Trent's S.J. 16.) Although the second clause of the second sentence in § 9 of the agreements does not apply to this case because Digital did specify a termination date, it supports the reading of the termination clause that the thirty days are calculated from the time of AB & T's and Trent's receipt of written notice. As such, AB & T's and Trent's termination date will be deemed to be September 1, 1995.

The plaintiffs argue that the termination should be void because Digital only provided twenty-nine days notice. The appropriate resolution is simply to change the termination date to September 1, 1995 as I have done. *See Fenoglio v. Augat, Inc.*, 50 F.Supp.2d 46, 52 (D.Mass.1999) (holding under Massachusetts law that effective date of termination is date that is contractually specified time following notice).

**21.** The extent of the orders need not be exact. *See Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 673, 429 N.E.2d 21 (1981) ("Gram I") (permitting calculation of damages based upon reasonable future expectations).

**22.** I note that while the purchase orders were not finalized until September 21, 1995, Digital initiated shipments to Circuit City on September 5, 1995. (Pl.'s SOF Ex. 31.)

tation of future orders); *King v. Mannesmann Tally Corp.*, 847 F.2d 907 (1st. Cir. 1988) (denying commission to sales representative terminated months before sale even though sales representative helped get employer named as a vendor for the product).

■ Detailing also does not form the basis for a claim as it does not give rise to an identifiable, future benefit. Although sales representatives that performed detailing were given a higher commission rate, the additional commission depended upon indeterminate future orders. (Pl.'s Ex. 9.) For instance, the purchasers may order more or less than anticipated or Digital may exercise its right to reject orders. (Agreements § 6(a), Pl.'s SOF Exs. 1–2.) Furthermore, detailing was an ongoing process so that even in retrospect it is difficult if not impossible to identify which commissions were related to which detailing.

■ I only retain this claim because of the parties' dispute as to what exactly constitutes a purchase order. If the alleged four purchase orders were in fact purchase orders, then they become the basis of the breach of the express contract claim. *See supra* § IV.B. On the other hand, if the four purchase orders are not "technically" purchase orders, there may still be a claim for a breach of the implied covenant because they may evidence sales on the brink of completion. For these reasons, summary judgment will be denied as to the parties' respective motions.

### D. *Reliance Contract*

■ An additional theory of recovery under the plaintiffs' breach of contract claim is based on what would ordinarily be termed "promissory estoppel." (AB & T Complaint ¶ 114; Trent Complaint ¶ 170.) Massachusetts law has rejected the "promissory estoppel" label, treating estoppel-based contract claims as traditional contract claims with the caveat that reasonable reliance is used as a substitute for consideration. *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850, 647 N.E.2d 1174 (1995); *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 761, 384 N.E.2d 176 (1978). In practice, however, this distinction has not altered the elements of such a claim from the traditional promissory estoppel definition.

■ In order to establish a claim for a contract based on reliance, the plaintiffs must show that a promise was made which the promisor reasonably expected to induce reliance, that the promisee actually and reasonably relied on that promise, and that injustice can be avoided only by enforcement of the promise. *Steinke v. Sungard Fin. Sys., Inc.*, 121 F.3d 763, 776 (1st Cir.1997) (quoting *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1380 (1st Cir.1991)); *Piantes v. Pepperidge Farm, Inc.*, 875 F.Supp. 929, 935 (D.Mass.1995).

■ The parties focus much of their memoranda on the question of reasonable reliance, which I will discuss below; however, I first focus on "[a]n essential element under the promissory estoppel theory [ ] that there be an unambiguous promise." *Varadian*, 419 Mass. at 848, 647 N.E.2d 1174 (quoting *Pappas Indus. Parks, Inc. v. Psarros*, 24 Mass.App.Ct. 596, 599, 511 N.E.2d 621 (1987)). Such a promise is not sufficiently shown where it is "made with an understood intention that it is not to be legally binding, but only expressive of a present intention." *Varadian*, 419 Mass. at 850, 647 N.E.2d 1174 (quoting *Kuzmeskus v. Pickup Motor Co.*, 330 Mass. 490, 493, 115 N.E.2d 461 (1953)). In *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 647 N.E.2d 1174 (1995), the Supreme Judicial Court held as a matter of law that an oral statement made in the face of a written contract was not a "promise" or "commitment" for promissory estoppel purposes because the existence of a written contract demonstrated the parties intention that it would govern their intri-

cate transaction. 419 Mass. at 850, 647 N.E.2d 1174.

Here, neither plaintiff can demonstrate that the alleged oral representations made by Digital constituted an offer or commitment as required under Massachusetts law.

In the case of Trent, there is not even a showing of a direct oral statement made individually to Trentacoste from anyone at Digital. Any statements made by Keller or others at Digital to the group of representatives at the Westford meeting could not be considered a commitment by Digital to a three year deal but merely hopes or expectations for the Starion line. *See Steinke,* 121 F.3d at 776.

In the case of AB & T, by contrast, of course, Keller made individual and specific oral statements to Tydings regarding the proposed duration of AB & T's relationship with Digital. (*See* Tydings Dep. at 149–50, 248.) These statements by Keller, however, cannot be seen as a commitment or promise by Digital because it was clear that both Tydings and Keller understood that any such promises would not be legally binding. *See Varadian,* 419 Mass. at 850, 647 N.E.2d 1174. Instead, as Keller told Tydings twice, no three year term would be included in the Agreement because "I can't get anything like that past the attorneys at [Digital]." (Tydings Dep. at 150.) It would be hard to imagine a statement that more clearly shows that Keller's oral representations would not be legally binding.

Moreover, even if it could be said that Digital's oral representations were "promises" or "commitments", I must find as a matter of law that the plaintiffs have not demonstrated reasonable reliance. I make this finding even after considering questions of the industry custom as submitted by the plaintiffs. While the reasonableness of any action is often a question for the jury, in this case no reasonable jury could find reliance by the plaintiffs.

In the case of Trent, it was plainly unreasonable to rely on general statements of expectation for the Starion line made to the group of representatives at the Westford meeting. *See Steinke,* 121 F.3d at 776–77 (finding lack of reasonable reliance as a matter of law). Trentacoste even admitted that such statements were "a three-year plan to achieve these goals" and that he thought they meant that the representatives would be there to implement the plan. (Trentacoste Dep. at 127.) This being the only such representations made to Trent, it is clear that any reliance on them would be unreasonable.[23]

In the case of AB & T, reliance was also unreasonable as a matter of law. Even accepting, as I must, Tydings uncorroborated oral testimony regarding Keller's representations, this testimony "[s]tanding alone, in direct contradiction to the written contract and unsupported by any evidence ... [is] not sufficient to create a jury question...." *Buker,* 16 Mass.App.Ct. at 44, 448 N.E.2d 1299 n. 9. In addition, as the Supreme Judicial Court has held, where the evidence does "not warrant a finding that a 'promise' in the contractual sense had been made, any reliance by the defendants ... would be unreasonable as a matter of law." *Varadian,* 419 Mass. at 850, 647 N.E.2d 1174. Keller's personal assurances of working together for three to five years were insufficient to induce a reasonable person to rely on them and Tydings appeared to recognize this. The AB & T President attempted to have these assurances memorialized by Digital in the Agreements, but was unable to convince Keller to do so. Keller's hesitance to put

---

**23.** This is true regardless of whether it is the normal industry custom to refrain from terminating such sales agreements for at least a year. (*See* Decl. of Brown ¶ 24.) This custom does not add to the reasonableness of relying on general representations, such as those made to the group of representatives at the Westford meeting, in the face of a written contract that is clearly terminable at will. *See Buker,* 16 Mass.App.Ct. at 44 n. 9, 448 N.E.2d 1299.

the three year "promise" in writing would have sent off alarm bells to the reasonable person warning him not to rely on such statements.

E. *Mass. Gen. Laws ch. 93A, § 11*

In their complaints, the plaintiffs allege numerous tort based theories of recovery under Mass. Gen. Laws ch. 93A, § 11 ("Chapter 93A"). (*See* AB & T Complaint ¶¶ 92–99; Trent Complaint ¶¶ 152–59.) In addition, they allege that a violation of Chapter 93A occurred by reason of Digital's breach of contract or warranty. (*See id.*) As a result of my resolution of choice of law issues, *supra* § III; the fraud claims, *infra* § V, the civil RICO claims, *infra*, § VI; the misappropriation of trade secrets, *infra* § VII; and the tortious interference with prospective advantage claim, *infra* § VIII, only the latter contract based claims under Chapter 93A remain.

■ Chapter 93A remedies are available to

> [a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two.

Mass. Gen. Laws ch. 93A, § 11. Chapter 93A, Section 2 referenced in the above passage does not provide a specific defi-

nition of what constitutes an "unfair or deceptive act or practice." *Id.* § 2(a). Because Chapter 93A, § 11, deals with disputes between persons engaged in trade or commerce,[24] the Appeals Court of Massachusetts in *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149 (1979), required that the alleged wrongful conduct in that setting must "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id.* More recently, in *VMark Software, Inc. v. EMC Corp.*, 37 Mass.App.Ct. 610, 642 N.E.2d 587 (1994), the Appeals Court stated the "rascality" requirement does not mean an act must "attain the antiheroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness." 37 Mass.App.Ct. at 620, 642 N.E.2d 587.

[29] While the above language does not offer much practical guidance when analyzing a particular claim,[25] it is well settled that a simple breach of contract is never enough, by itself, to constitute a violation of Chapter 93A. *Pepsi–Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir.1985); *see also, Madan v. Royal Indem. Co.*, 26 Mass.App.Ct. 756, 762, 532 N.E.2d 1214 (1989) (citing *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 100–01, 390 N.E.2d 243 (1979)).

■ This case, however, does not raise merely a simple breach of contract claim.

---

**24.** Section 9 addressed causes of action for consumers against persons engaged in trade or commerce. *See* Mass. Gen. Laws ch. 93A, § 9.

**25.** The case law presents certain litmus tests to evaluate whether a colorable Chapter 93A violation exists. These include such vivid but ultimately uninstructive phrases as "level of rascality" (*Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149 (1979)) and "rancid flavor of unfairness" (*Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219, 226, 598 N.E.2d 666 (1992). More recent and consid-

ered case law relies less on rhetorical flourishes. *See Cambridge Plating Co. v. Napco, Inc.* 85 F.3d 752, 768 (1st Cir.1996); *Mass. Employers Ins. Exch. v. Propac–Mass, Inc.*, 420 Mass. 39, 42–43, 648 N.E.2d 435 (1995). That case law instructs that the focus must be on the nature of the challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a Chapter 93A fairness determination. *Mass. Employers Inc. Exch. v. Propac–Mass, Inc.*, 420 Mass. at 42–43, 648 N.E.2d 435 (1995).

Rather the plaintiffs have shown a triable issue of fact as to a breach of the implied covenant of good faith and fair dealing in at-will employment contracts. Inherent in this claim is an element of either bad faith and improper motive or a breach of fair dealing in depriving an employee of "reasonably ascertainable future compensation based on his past services." *Gram I*, 384 Mass. at 671, 429 N.E.2d 21. By their very terms both of these elements clearly fall into "established common law . . . concept[s] of unfairness." *VMark*, 37 Mass. App.Ct. at 620, 642 N.E.2d 587. While the Supreme Judicial Court has not specifically held that a violation of the implied covenant of good faith and fair dealing qualifies as a deceptive act under Chapter 93A,[26] it has recognized violations of Chapter 93A in circumstances similar to those in *Fortune* and its progeny. *See Wang Lab., Inc. v. Bus. Incentives, Inc.*, 398 Mass. 854, 856–59, 501 N.E.2d 1163 (1986) (finding violation of Chapter 93A where independent tax advisor was denied commissions due under contract after decision to handle tax matters in-house); *see also Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 298, 408 N.E.2d 1370 (1980) (using *Fortune* as an example of violation of good faith requirement under Massachusetts law).

Thus, having found a triable issue of fact with respect to the plaintiffs' claims for violation of the implied covenant of good faith and fair dealing, I cannot say as a matter of law that a similar claim under Chapter 93A is outside of that act's definition of an unfair or deceptive act or practice. While the determination of whether a claim properly fits within the boundaries of Chapter 93A is a question of law, whether a particular set of facts is unfair or deceptive in a given situation is a question of fact. *Schwanbeck v. Federal–Mogul Corp.*, 31 Mass.App.Ct. 390, 414, 578

N.E.2d 789 (1991), *rev'd on other grounds*, 412 Mass. 703, 592 N.E.2d 1289 (1992). Thus, I must deny all motions for summary judgment as to the plaintiffs' Chapter 93A claims to the extent that they are based on violations of the implied covenant of good faith and fair dealing. As to all other Chapter 93A claims sounding in either contract or tort, the defendant's motion for summary judgment is granted.

## V. FRAUD CLAIMS

As discussed in § III *supra*, for choice of law purposes, all tort claims against Digital asserted by AB & T must be analyzed under Maryland law. All tort claims pressed by Trent, however, are controlled by Massachusetts law. Thus, although I find no significant differences between the two jurisdictions with respect to fraud claims, I will perform a separate analysis for each.

### A. *AB & T—Maryland Law*

Under Maryland law, fraud or fraudulent misrepresentation consists of five essential elements. The plaintiff must demonstrate that there was a representation of fact and:

(1) that the representation made [was] false;

(2) that its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge;

(3) that it was made for the purpose of defrauding the person claiming to be injured thereby;

(4) that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that [s]he would not have done the thing from which the injury

**26.** This is probably due to the fact that employees cannot as a general rule bring Chapter 93A claims against their employer. *See Manning v. Zuckerman*, 388 Mass. 8, 444 N.E.2d 1262 (1983). Where, as here, the

plaintiff is an independent contractor, Chapter 93A claims are available. *Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221 (D.Mass. 1990).

resulted had not such misrepresentation been made; and

(5) that [s]he actually suffered damage directly resulting from such fraudulent misrepresentation.

*Miller v. Fairchild Indus., Inc.,* 97 Md. App. 324, 341, 629 A.2d 1293 (1993) (quoting *Martens Chevrolet v. Seney,* 292 Md. 328, 333, 439 A.2d 534 (1982) (citations omitted)). In contrast to most jurisdictions, the plaintiff must establish these elements, not by a mere preponderance of the evidence, but by clear and convincing evidence. *Aeropesca Ltd. v. Butler Aviation Int'l., Inc.,* 44 Md.App. 610, 623, 411 A.2d 1055 (1980).

■■■ Maryland law follows a general rule that "statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud." *Miller,* 97 Md.App. at 342, 629 A.2d 1293 (quoting *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 232, 469 A.2d 867 (1984)). An exception to this rejection of fraud claims based on promissory statements is recognized where such statements are made with the present intention that they will not be honored. *Id.* at 343, 629 A.2d 1293. In any event, the statements made must be false and not merely misleading or examples of puffery. *Id.* at 344–45, 629 A.2d 1293.

■■■ In the case of AB & T, there has been no sufficient showing, particularly in light of the heightened burden of proof, that a reasonable jury could find that Digital acted fraudulently. The statements put forth by AB & T as constituting misrepresentations [27] are expressions of future expectations and promissory in nature.

Thus, in order to state a claim for fraud under Maryland law the plaintiffs would have to establish sufficient evidence to show that Digital knew and intended—at the time that it made them—that the statements were false. *See Tufts v. Poore,* 219 Md. 1, 10, 147 A.2d 717 (1959).

While an issue of intent is normally a question of fact for the jury, the plaintiffs here have shown no evidence of fraudulent intent by Digital. There is no evidence to show that at the time that Keller and others from Digital made statements about a three year time commitment—in January and February 1995—that Digital had no intention to keep the representative employed for that amount of time. In fact, the evidence tends to show that as late as July 14, 1995, Digital's budget for the following year provided for representatives' commissions. (*See* Def.'s Trent SOF, Ex. M.)

In addition, the plaintiffs assert that Digital committed fraud when it claimed that it was committed to entering and succeeding in the retail market.[28] Again, even if this type of vague, future expectation could be a statement, there is insufficient evidence that at the time it was made, Digital did not intend to make a commitment to succeeding in the retail market.[29]

### B. *Trent—Massachusetts Law*

■■■ Under Massachusetts law, the requirements for fraudulent misrepresentation are quite similar to those of Maryland law. A plaintiff must prove that "the defendant made a false representation of material fact with knowledge of its falsity, that the defendant made the statement for the purpose of inducing the plaintiff to act

---

**27.** The primary statements relied on by AB & T are the several aforementioned promises by Keller that the Starion line would run for at least three to five years.

**28.** The plaintiffs refer to two instances when Digital made this statement. The first was to the representatives at the Westford meeting and the second was to Circuit City at a July 5, 1995 meeting. (*See* Pl.'s Opp. at 15.) I will only address the first instance above, because

it is clear that the second statement could not have been intended to defraud AB & T since it was made to Circuit City and was well after the plaintiffs signed the contracts.

**29.** Plaintiffs cite to a trade periodical where Digital's CEO, Robert Palmer, stated in June 1996 that Digital's attempt to market the Starion line was an experiment. (*See* Pl.'s Ex. 14.) I decline to find that this article creates a jury question on the issue of fraud.

thereon, and that the plaintiff relied upon that statement to his or her detriment." *Piantes v. Pepperidge Farm Inc.*, 875 F.Supp. 929, 933 (D.Mass.1995) (quoting *Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221, 226 (D.Mass.1990)). As in Maryland, "statements that concern matters of opinion, conditions to exist in the future, or matters promissory in nature are not actionable." *Id.* The same exception to this general rule that exists in Maryland also is recognized in Massachusetts. *Id.* The Supreme Judicial Court has stated, however, that "[i]ntention not to perform a promise, existing when made, cannot be shown merely by nonperformance of the promise....[it] must be shown by other evidence." *Galotti v. United States Trust Co.*, 335 Mass. 496, 501–02, 140 N.E.2d 449 (1957).

▮▮▮ As discussed above, there has been no evidence put forth to show that any statements made by Keller or others at Digital were known to be false at the time they were made. In his deposition, Trentacoste stated that he believed Keller meant what he said to the group at the Westford meeting. (See Trentacoste Dep. at 196.) Thus, the plaintiffs have offered no evidence to rebut the facts in the record that tend to show that Digital's decision to terminate the representatives was made in late July, 1995. (Def.'s Trent SOF ¶¶ 45–48.)

In addition, as discussed in the context of promissory estoppel, there has been no evidence adduced that would support Trent's reasonable reliance on statements which may be attributable to Digital. All such statements were general expectations made at the Westford meeting to the group of representatives. Reliance on such statements of general business goals for the future has been found by Massachusetts courts to be unreasonable as a matter of law. *McCartin v. Westlake*, 36 Mass.App.Ct. 221, 232 n. 11, 630 N.E.2d 283 (1994).

Therefore, while questions of intent and reasonableness are normally for the jury, where, as here, there is insufficient evidence for a reasonable jury to conclude that Digital acted fraudulently, I must find as a matter of law that Digital did not commit fraud. *See Galotti*, 335 Mass. at 500–01, 140 N.E.2d 449.

## VI. CIVIL RICO CLAIMS

▮▮▮ Digital moves for summary judgment as to the plaintiffs' civil "RICO" claims, (AB & T Complaint Count II; Trent Complaint Count II), on the grounds that the plaintiffs have not established a sufficient "investment injury" under the Act; that they cannot prove the requisite predicate acts of mail and wire fraud; and that they have not established a "pattern of racketeering activity." (Def.'s Trent Mem. at 11–12.) The plaintiffs' RICO claims are based on an alleged fraudulent scheme perpetrated by Digital in an attempt to manipulate the retail market for personal computers which resulted in violations of the federal mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, statutes. (*See* AB & T Complaint ¶¶ 73–88.)

Because I have found that Digital has not performed fraudulent acts or misrepresentations, the asserted violations of the mail and wire fraud statutes must fail as a matter of law. Thus, plaintiffs cannot establish the predicate acts supporting their civil RICO claims; consequently, those claims must fail. *See United States v. Angiulo*, 847 F.2d 956, 964 (1st Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988). In addition, given the relatively short period of the alleged "scheme" in this case, and the inability of plaintiffs to show that any related predicate acts "amount to or pose a threat of continued criminal activity," *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 444 (1st Cir. 1990) (quoting *H.J., Inc. v. Northwestern Bell Tele. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)), the plaintiffs have also failed to demonstrate the

necessary "pattern" of racketeering activity.

Thus, I will grant the defendant's motion for summary judgment as to all civil RICO claims.

### VII. MISAPPROPRIATION OF TRADE SECRETS[30]

A. *Mass. Gen. Laws ch. 93, § 42*

Both Trent, (Trent Complaint, Count V), and AB & T, (AB & T Complaint Count VI), have asserted claims for theft of trade secrets against Digital pursuant to Mass. Gen. Laws ch. 93, § 42. Digital argues that the information the plaintiffs claimed Digital misappropriated is not a "trade secret" and, in the alternative, neither plaintiff made any effort to keep the information confidential.

As a preliminary issue, any claim by AB & T pursuant to Mass. Gen. Laws ch. 93, § 42 must be dismissed for conflict of laws reasons. The controlling passage of this statute provides:

> Whoever embezzles, steals or unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains from any person or corporation, with intent to convert to his own use, any trade secret regardless of value, shall be liable in tort
> . . .

Mass. Gen. Laws ch. 93A, § 42. Because this provision by its terms creates tort liability it is governed by the choice of law analysis for tort claims asserted by AB & T. Thus, I will dismiss this count as to AB & T because Maryland law controls all tort actions brought by this plaintiff.

▮ It appears that the subject of Trent's misappropriation of trade secrets claim is a collection of sales data[31] that it

compiled for the retail computer dealers in Trent's New York Metropolitan area, (Trent Complaint ¶ 89(b)), as well as Trent's "unique and valuable knowledge, expertise and long standing relationship with several PC products retailers in Trent's market area." (Trent Complaint ¶ 89(a).) This type of material is not protectable under Mass. Gen. Laws ch. 93, § 42.

Under Massachusetts law, a trade secret is defined as "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement." Mass. Gen. Laws ch. 266, § 30(4).[32] The Supreme Judicial Court has held that the general business information and the routine data of a company is ordinarily not protectable as confidential. *Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 169, 565 N.E.2d 415 (1991). The court went on to hold that in some limited circumstances it is conceivable that gross annual sales of a company might be considered protectable *by the company itself* if it takes reasonable steps to keep the information confidential. *See id.*

This requirement that a claimant take "all proper and reasonable steps" to keep the information confidential is the "crucial issue to be determined in cases involving trade secrets." *Commonwealth v. Robinson*, 7 Mass.App.Ct. 470, 473, 388 N.E.2d 705 (1979) (quoting *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840, 282

---

**30.** With respect to all of the Counts regarding misappropriation of trade secrets, it appears that the plaintiffs have conceded their invalidity. Nowhere in the plaintiffs' opposition papers do they address Digital's arguments requesting summary judgment as to these claims. Given this apparent concession, I will deal only briefly with the facts and the law surrounding these claims.

**31.** This data compilation allegedly included the "sales volume of said retailers, the expect-

ed demands of said retailers, the particular products required by said retailers in order to enable said retailers to offer the range and selection of products that the retailers desired, and the profit margins of said retailers." (Trent Complaint ¶ 89(b).)

**32.** Mass. Gen. Laws ch. 93, § 42 incorporates by reference the definition of trade secrets found in Mass. Gen. Laws ch. 266, § 30.

N.E.2d 921 (1972)). Factors to consider on this question include the existence or absence of an express agreement restricting disclosure; the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized parties; the circumstances under which the information was disclosed to the defendant; and the degree to which the information has been placed in the public domain by the possessor. *USM Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 98, 393 N.E.2d 895 (1979) (citations omitted). In this way, the onus is on the possessor of the alleged trade secret to make "constant warnings... [and to obtain] an agreement, preferably in writing, acknowledging its secrecy and promising to respect it." *Robinson,* 7 Mass.App.Ct. at 473, 388 N.E.2d 705 (quoting *J.T. Healy & Son v. James A. Murphy & Son,* 357 Mass. 728, 738, 260 N.E.2d 723 (1970)).

Here even if it were possible in general to protect the business data of another company or the expertise of an experienced marketing representative that Trent alleges here, there is no evidence that Trent tried to keep this information confidential through warnings or an express agreement with Digital. In fact, Trentacoste admitted that he gave the information to Digital without even explaining that it was confidential. (Def.'s Trent SOF ¶ 57.) Given this complete lack of measures to keep the data compilations confidential, I must find as a matter of law that the information is not a trade secret under Mass. Gen. Laws ch. 93, § 42.

### B. *"Theft of Trade Secrets and Misappropriation of Proprietary Information"*

■ In Count V of its Complaint, AB & T makes a general claim that Digital stole "trade secrets and proprietary information of AB & T." AB & T does not indicate under what theory of law it is asserting this claim, but I will assume that this claim is made under Maryland's Uniform Trade Secrets Act (UTSA), MD. COM. LAW CODE ANN. § 11–1201–1209 (1990). A trade secret under the UTSA is defined as

information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MD. COM. LAW CODE ANN. § 11–1201(e)(1) & (2) (1990). In Maryland, "[p]ricing information and marketing strategy are protectable [sic] as as 'trade secrets.'" *Optic Graphics, Inc. v. Agee,* 87 Md.App. 770, 778, 591 A.2d 578 (1991). Such information has been found not to be a trade secret when it could be obtained by simply talking with prospective purchasers. *See id.* at 788, 591 A.2d 578.

In this case, the data compilations claimed by AB & T to constitute trade secrets are similar to those offered by Trent.[33] Regardless of whether this information would meet the first prong of Maryland's trade secrets definition, under no standard of reasonableness has AB & T demonstrated an effort to keep this information confidential. While Tydings stated in his deposition that the information was "a confidential database" there is no evidence that he told Keller that the information was confidential. (*See* Tydings Dep. at 492–93.) In addition, to the degree AB & T's trade secrets claim is based on Digital obtaining this information through fraudulent means, I have found such a contention generally unsupported.

---

**33.** This information includes "sales volume of said retailers, the expected demands of said retailers, the particular products required by said retailers in order to enable said retailers to offer the range and selection of products that the retailers desired, and the profit margins of said retailers." (AB & T Complaint ¶ 22(b).)

## VIII. TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE

In their final claim, the plaintiffs allege that Digital tortiously interfered with their business relationships with retail computer outlets with which the plaintiffs dealt on behalf of Digital. In order to understand this claim fully, it will be helpful to lay out certain facts and argument.

As discussed above, one of the characteristics of a successful representative is the quality of its relationships with retail buyers. (Decl. of Brown ¶ 11.) The plaintiffs claim that Digital encouraged the representatives to procure purchase orders from several lower volume retailers in their respective territories with the full knowledge that it would not be able to fill those orders. (AB & T Complaint ¶ 50(d) & (e).) By not filling the orders of low volume retailers, Digital allegedly intended to create shortages in inventory at these stores that would create a perceived demand for the Starion line that would in turn increase sales at the high volume retail outlets which Digital had a greater interest in pursuing. (AB & T Complaint ¶ 50(e)(i) & (ii).) The plaintiffs also claim that this scheme was intended to cause the low volume retailers to blame the representatives who courted the sale (i.e. Trent and AB & T) instead of Digital, and thus undermine the plaintiffs' professional goodwill and reputation with these retailers. (AB & T Complaint ¶ 50(e)(iii) & (iv).)

The record evidences that Digital's production capacity for the Starion line for the fall was approximately 55,000 units. (Inter–Office Memo, Pl.'s Ex. 21.) In addition, the record contained a letter dated March 27, 1995 from a Digital executive to the representatives indicating that there would be a shortfall between production capacity and purchase orders for the upcoming months. (March Letter, Pl.'s Ex. 13.) The letter indicated that some purchase orders previously submitted might be affected as well as numerous orders yet to be submitted. (*Id.*) There is also documentation demonstrating that in July, 1995, Digital was negotiating with Circuit City to provide approximately 43,000 units for the fall. (Circuit City Projections, Pl.'s Ex. 23.)

### A. *Trent—Massachusetts Law*

In Massachusetts, a claim for intentional interference with advantageous business relations requires the plaintiff to establish:

(1) the existence of a business relationship or contemplated contract of economic benefit; (2) defendant's knowledge of such relationship; (3) the defendant's intentional and improper interference with that relationship; and (4) the plaintiff's loss of advantage as a direct result of the defendant's conduct.

*Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F.Supp. 404, 421 (D.Mass.1995). This cause of action is an extension of the tort of intentional interference with a contractual relationship, except that the business relationship need not be a formal one reduced to a writing. *Chemawa Country Golf, Inc. v. Wnuk*, 9 Mass.App.Ct. 506, 509–10, 402 N.E.2d 1069 (1980).

It is essential to show that the defendant's conduct was made without cause and with the requisite state of mind. *See Mass Cash Register, Inc.*, 901 F.Supp. at 422. Initially, the Supreme Judicial Court required a showing of actual malice on the part of the defendant, *ELM Medical Lab., Inc. v. RKO Gen., Inc.*, 403 Mass. 779, 787, 532 N.E.2d 675 (1989), recently, however, the court has rejected that language in favor of a somewhat lesser showing of "improper motive or means." *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 816, 551 N.E.2d 20 (1990). Inherent in this requirement is the idea that simply showing an interference with business relations is not enough. *Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1198 (D.Mass.1990). In addition, merely being motivated by financial benefit has not been found to be an improper

motive. *See Geltman,* 406 Mass. at 817, 551 N.E.2d 20.

. With respect to Trent, there has been no demonstration in the record of an improper motive by Digital or the use of improper means to interfere with Trent's relationship with retailers. There is, to be sure, some evidence of Digital eliciting purchase orders that they may not have been able to fill. But this is the only snippet of evidence in the record that Trent can point to in support of its elaborate allegations.[34] Thus as a matter of law I must find that Trent has failed to put forth evidence to satisfy the required mental state of intentional and improper interference.[35]

### B. *AB & T—Maryland Law*

 In Maryland, the tort of interference with business relations appears to involve the same elements as in Massachusetts, in fact the presently controlling test in Maryland was borrowed from Massachusetts law.[36] *See K & K Management, Inc. v. Lee,* 316 Md. 137, 155, 557 A.2d 965 (1989) (setting out elements of tort by quoting *Walker v. Cronin,* 107 Mass. 555, 562 (1871)). The only appreciable difference between Maryland and Massachusetts law springs from the latter's recent rejection of the element of malice. Maryland still adheres to the more stringent state of mind requirement. *Id.* Because AB & T offers no further evidence of Digital's scheme to tortiously interfere with its business relations, I base my denial of its claim on the analysis set forth above with respect to Trent.

### IX. CONCLUSION

For the reasons stated more fully above:

I DENY Plaintiffs' Motion for Summary Judgment.

I GRANT the Defendant's Motion for Summary Judgment except as it pertains to the plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, the plaintiffs' claims under Mass. Gen. Laws 93A, § 11 based on violations of the implied covenant of good faith and fair dealing, and plaintiffs' breach of contract claims for commissions related to purchase orders submitted before August 31, 1995. The Clerk shall set these matters down for a status conference. In the interim, damages discovery consistent with the Memorandum shall proceed. And, accordingly, the "Motion of Plaintiffs to Deem as Admitted All Matters and Things which the Plaintiff Requested..." is hereby DENIED.

---

34. It is important to note that the plaintiffs here do not claim that Digital's termination of their own contracts tortiously interfered with their business relations. Instead, the plaintiffs allege Digital planned to intentionally underproduce units for the Starion line to cause shortages for low volume retailers thereby producing a false climate of demand. Anger about unfilled orders then fell onto the plaintiffs in this scenario damaging their relationships with the retailers. This scheme does not implicate Digital's termination of the Agreements.

35. In addition, the plaintiffs have not supported any allegations of loss or damage resulting from the alleged scheme with specific evidence. Mere allegations of injuries to their "goodwill and business reputation", (Trent Complaint ¶ 151), "among their existing customer base and in the PC products industry at large", (AB & T Complaint ¶ 60), are not sufficient to defeat a motion for summary judgment. *See Mass Cash Register,* 901 F.Supp. at 422.

36. The elements as quoted are:

(1) [I]ntentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Lee,* 316 Md. at 155, 557 A.2d 965 (quoting *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 69, 485 A.2d 663 (1984) (quoting *Willner v. Silverman,* 109 Md. 341, 355, 71 A. 962 (1909) (quoting *Walker v. Cronin,* 107 Mass. 555, 562 (1871)))).